John Gatling v. Commissioner.
Gatling v. Commissioner
Docket No. 57487.
United States Tax Court
T.C. Memo 1959-224; 1959 Tax Ct. Memo LEXIS 22; 18 T.C.M. (CCH) 1074; T.C.M. (RIA) 59224; November 30, 1959
*22 Respondent's determination of deficiency for 1946 approved with certain adjustments. His determination of addition for failure to file a return for 1946 approved, but his addition to tax for fraud for that year disapproved. Respondent's determination of income by the net worth method for the years 1947 through 1950 approved with certain adjustments. Additions to tax for fraud under section 293(b), I.R.C. of 1939, for the years 1947, 1948 and 1949 approved. Addition to tax under section 294(d)(1)(A), I.R.C. of 1939 approved for the year 1950, but addition under section 294(d)(2) disapproved. Held, that the statute of limitations does not bar assessment and collection of the tax liabilities for any of the years in question. $2Held, further, that petitioner is not entitled to dependency credits for his father and mother for the year 1950. Herman Wolff, Jr., Esq., and T. Lacy Williams, Esq., Commercial Building, Raleigh, N.C., for the petitioner. Richard C. Forman, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax and additions thereto for the years and in the amounts as follows: Additions to Tax
Sec.
Sec.
Year
Income Tax
Sec. 293(b)
Sec. 291(a)
294(d)(1)(A)
294(d)(2)
1946
$ 395.40
$ 197.70
$98.85
1947
2,063.30
1,031.65
1948
1,984.93
992.47
1949
2,456.82
1,228.41
1950
1,038.78
519.39
$123.84
$78.21
By *23 amendment to his answer the respondent conceded that his determinations of deficiency and addition to tax for 1948 were excessive to the extent of $982.54 and $491.27, respectively, but made claim for increases in the deficiency and addition to tax for the year 1949 to the extent of $829.98 and $414.99, respectively, and for 1950 to the extent of $436.80 and $218.40, respectively. The principal issue raised by the petitioner is whether the respondent was justified in computing the taxable income for the years 1947 to 1950, inclusive, by the increase in net worth plus nondeductible expenditures method, and if so, whether the computation was correct. Also involved is the question whether petitioner is liable for additions to tax on account of fraud for all years and whether assessment and collection of any deficiencies and additions to tax for all the years are barred by the statute of limitations. Other issues presented are whether petitioner is entitled to a deduction for depreciation of his rental homes for 1946 at a rate of 6 per cent, and to dependency credits for his parents in 1950. Also in issue is respondent's determination of additions to tax for the year 1946 under section 291(a) *24 for failure to file a return and additions to tax for the year 1950 under section 294(d)(1)(A) and 294(d)(2) for failure to file a declaration of estimated tax and for substantial underestimation of estimated tax. Findings of Fact Some of the facts are stipulated and are found as stipulated, the stipulation being incorporated herein by this reference. The petitioner is an individual residing in Raleigh, North Carolina. For the taxable years 1947 through 1950 petitioner filed individual Federal income tax returns with the then collector of internal revenue in North Carolina. The Internal Revenue Service has no record of any income tax returns filed by petitioner prior to 1939, or for the years 1942 and 1946. Petitioner filed returns showing no tax due for the years 1939, 1941, 1943, 1944, and 1945. He filed a return for 1940 and paid a tax of $23.94. Petitioner filed no declaration of estimated tax for 1950, and the Internal Revenue Service has no record of petitioner's having paid estimated tax for years prior thereto. The petitioner is a graduate in electrical engineering. He was born in 1898 and has lived in Raleigh, North Carolina, all his life with the exception of periods of *25 time when he was in the Army during World War I and World War II, and from 1921 to 1923 when he worked in the western part of the state. During World War I he was commissioned and served as second lieutenant in the United States Army. Commencing in 1921 he was employed by the North Carolina State Highway and Public Works Commission as an engineer and a bridge designer and he remained so employed until 1942. The following is a schedule of the salary received by petitioner from the North Carolina State Highway and Public Works Commission from 1921 to 1942: Year
Amount
1921
$ 480.00
1922
1,365.00
1923
1,485.96
1924
1,048.70
1925
1,650.00
1926
2,025.00
1927
2,160.00
1928
2,220.00
1929
2,220.00
1930
1,541.66
1931
2,130.00
1932
$ 1,890.00
1933
1,683.75
1934
1,740.00
1935
1,890.00
1936
2,082.00
1937
2,232.00
1938
2,340.00
1939
2,340.00
1940
2,350.00
1941
2,400.00
1942
1,773.33
Total
$41,047.40 This salary prior to January 1, 1939, was not subject to the Federal income tax. At undisclosed times during the period 1923 to 1942, petitioner had additional income from part-time engineering work. In one instance he received $700 for work in designing a bridge and in another instance he received $250 for making an estimate. During this period *26 he also engaged, to a small extent, in training and selling bird dogs. When petitioner was discharged from the Army in 1919 he had approximately $1,000 which he invested in 6 per cent preferred stock of Carolina Power & Light Company. In 1923 he opened a margin trading account with a stock brokerage firm and dealt to some extent in corporate stocks. He also had another stock purchase financed through the Mechanic Savings Bank, paying that bank in 1931 a balance of purchase price of $697.91. In 1939 he quit trading in the stock market. The brokerage records for all years prior to 1941 have been destroyed. The records for 1941 show that during that year the petitioner owned 100 shares of Chrysler Corporation stock which had been purchased on margin, a debit balance being carried in the amount of approximately $4,500 to $5,000 throughout that year until December when the account was closed out, at which time the Chrysler stock was sold at a loss, and the petitioner received from the brokerage firm two checks in the respective amounts of $1,005.65 and $150. During October of that year the petitioner also received a payment of $500 from the brokerage firm. The petitioner had no other accounts *27 with that firm or any other broker in 1941. From that time through 1946 he had no stock market transactions. In 1939 petitioner began purchasing, improving, and constructing houses for rental. By 1942 he owned 27 houses, 21 of which were purchased from his uncle's estate. These were one-story, frame houses, with either composition or metal shingle roofs and without sanitary facilities. They were occupied by colored tenants, and were about 30 to 35 years old when purchased by the petitioner. During the time the 21 houses were held by the uncle's estate, they were not kept in good repair. In one instance the petitioner purchased 9 of such houses at a price of about $6,000, making down payments out of his own funds totaling about $1,500, and borrowing the remainder. During the period 1939 through November 1942, the petitioner expended at least $22,000 for the construction or improvements of houses. During that period he received approximately $15,000 in rents from all his properties, all of which was spent in repairs or improvements to the properties. The petitioner maintained a bank account at the Security National Bank in Raleigh. Over the period from July 30, 1940 to September 23, *28 1942 petitioner made deposits of at least $23,418.06 to this account. The money deposited included withdrawals from the stock account, borrowed money, and mortgages from other undetermined sources. At some time prior to World War II the petitioner borrowed $1,500 from his father on which he paid interest. Throughout the years 1947 through 1950 the remaining unpaid amount of this loan was $700. On June 21, 1941, petitioner filed a financial statement with the Security National Bank for the purpose of obtaining credit, and obtained a loan of $800. The financial statement showed assets of $42,140, including cash in banks of $490, marketable securities in the amount of $5,900, real estate of $35,000, and cash value of insurance policies of $750. Liabilities were stated at $11,350, including a $50 note payable to the Security National Bank, $3,000 owed to Merrill Lynch, Pierce, Fenner & Beane for which 100 shares of Chrysler stock valued at $5,900 were pledged, accounts payable of $300, and mortgages amounting to $8,000. The space provided for cash on hand was left blank. On February 10, 1942, petitioner submitted another financial statement as a result of which he obtained another loan, *29 in an undisclosed amount, from the Security National Bank. This statement listed assets at $40,025, consisting of cash on hand and in banks of $450, real estate of $39,000 and insurance of $575, notes payable to the Security National Bank of $333, accounts payable of $800, and mortgages of $13,000. Rental income was stated to be $415 per month and mortgage payments as being $198 per month. Petitioner paid interest on both loans obtained from the bank. The Security National Bank does not take into consideration the amount of cash on hand as a basis for credit when making a loan. In November 1942 petitioner returned to active duty in the Army and was commissioned a captain. He remained in the Army until December 1946 when he was discharged with the rank of major. During practically all his time in the Army, he was stationed in Washington, D.C., where he was attached to the provost marshal's office. His duties consisted of security work. During 1946 he lived in an apartment in Washington for which he paid rent of about $54 per month. At various times military personnel stayed with petitioner in his apartment for short periods. Some who were in security work sometimes left without saying *30 goodbye or stating where they were going. On such occasions they would leave money for their use of the apartment. Also on occasions petitioner upon requests of others gave parties in his apartment and purchased food and whiskey for which he was reimbursed. Some of his meals, while he was in Washington, were obtained at the Pentagon. He owned and used a car while stationed in Washington, D.C.
The petitioner's annual base pay, plus longevity, as a captain was approximately $2,500. As a major in the latter part of 1946 it was somewhat higher. His annual quarters and subsistence allowances were about $1,200. Such allowances and $1,500 of his salary were not subject to Federal income tax. While in the Army he customarily deposited his pay and allowances in his checking account at the Security National Bank in Raleigh. As of December 31, 1946, this checking account contained a balance of $92.28. No one other than petitioner wrote checks on this account. During the period November 1942 to December 1946, while the petitioner was in the Army, his 27 rental houses were managed by Bart F. Moore, who was his cousin and executor of his uncle's estate. The houses were rented through a rental agency *31 which charged 5 per cent commission, and collections by it were turned over to Moore who also charged a 5 per cent commission. All rental receipts were deposited by Moore in an account in the Security National Bank under the name of "Bart F. Moore, Agent for John Gatling." Moore was the only one who had access to this account. Moore paid the expenses such as essential repairs, insurances, taxes, interest, and commissions, and submitted monthly statements to petitioner showing the income and the expenditures. Moore also made some personal expenditures for petitioner, including payments of premiums on life insurance policies, payments into the North Carolina retirement fund, costs of keeping a bird dog and some automobile payments, expenses and insurance. Also, on two occasions Moore reimbursed petitioner a total of $265.28 for certain expenditures which petitioner had made on the rental properties. These were the only disbursements made by Moore directly to the petitioner prior to final settlement in 1947. The following is a summary of Moore's records with respect to the receipt of rental income and disbursements, including payments of petitioner's personal items, during the period *32 1943 through 1946: All Other
Rent
Expenses Except
Personal
Year
Received
Repairs
Depreciation
Expenditures
1943
$ 6,327.90
$ 322.99
$2,278.67
$ 732.80
1944
6,375.00
288.89
2,135.35
261.60
1945
6,306.88
323.11
2,233.54
536.02
1946
6,179.00
237.47
1,693.16
429.10
Total
$25,188.78
$1,172.46
$8,340.72
$1,959.52 Moore's records also show that $1,000 was borrowed in 1946 from the Security National Bank, of which $100 was repaid during the year. In addition to the disbursements listed in the above tabulation, Moore made other disbursements in 1946, of which approximately $1,900 was for permanent improvements on certain of petitioner's property located on Tarboro Street. The balance in Moore's bank account as agent at the end of the year 1946 was $1,868.47. At some time during January 1947, this account was closed out and Moore gave the petitioner a check in the amount of approximately $1,600 in settlement of the rental operations over the period from November 1942 to January 1947. Of the total rents collected and the $1,000 borrowed, a total of $26,188.78, the record before us accounts for only about $15,000. [1] *33 In addition to the expenditures made by Moore on the petitioner's properties in 1946, the petitioner himself made four trips by train from Washington to Raleigh to plan repairs to be made and expended $397.50 for repairs, for which he was not reimbursed out of funds held by Moore. While in Raleigh he stayed with his father and paid him room and board. The total cost of the four trips was $300, for which he was not reimbursed out of funds held by Moore. For the year 1946 the respondent determined that the petitioner had a tax liability in the amount of $396 (using the table provided in section 400 of the Internal Revenue Code of 1939), against which he was credited with 60 cents for tax withheld, resulting in a deficiency in tax of $395.40. He also determined that the petitioner was liable for an addition to tax under section 293(b) of $197.70, and an addition to tax for failure to file a return, in the amount of $98.85. The respondent determined the petitioner's taxable income for 1946 as follows: Rental income per records kept by Bart F. Moore, agent for John Gatling:
Receipts
$6,179.00
Expenses: Repairs
$ 237.47
Insurance and Taxes
273.73
Commission and other expenses
597.09
Interest
822.34
Depreciation
2,408.81
Total
4,339.44
Income from Rental
$1,839.56
Salary Income: U.S. Army Base Pay
$2,400.00
5% Longevity
120.00
Yearly
$2,520.00
1/12
$ 210.00
Plus quarters allowance per month
75.00
Plus subsistence $21.00 each 30 days
21.00
Plus subsistence $21.00 each 1 day
.70
Amount deposited in bank
$ 306.70
*34 6 months at $210.00
$1,260.00
5 months at $241.50 (raise 7/1/46)
1,207.51
N.C. State Highway and Public Works
Commission
50.00
Total Salary Received
$2,517.51
Less exclusion under sec. 22(b)(13)
1,500.00
Net Salary
$1,017.51
Taxable Income
$2,857.07
In his determination of the petitioner's taxable income for 1946, the respondent allowed 4 per cent depreciation on rental properties. Commencing in 1947 the petitioner claimed depreciation in his returns at a rate of 4 per cent on rental properties. The petitioner failed to file an income tax return for the year 1946, and such failure was not due to reasonable cause but was due to willful neglect. No part of the deficiency for 1946 is due to fraud with intent to evade tax. Upon being discharged from the Army in December 1946, petitioner returned to Raleigh and again was employed by the North Carolina State Highway and Public Works Commission until November 1949. His salary over that period was as follows: Year
Amount
1946
$ 50.00
1947
4,250.04
1948
3,770.80
1949
4,628.08
Total
$12,698.92
The petitioner filed income tax returns for the years 1947 to 1950, which showed the following salary, gross rental income, net rental income, adjusted gross income, and tax liability: *35 1947
1948
1949
1950
Salary - N.C. State Highway Commission
$4,250.04
$3,770.80
$ 4,628.08
Gross Rental Income
5,888.42
9,418.10
10,364.85
$11,298.91
Depreciation
2,861.51
3,462.32
3,954.32
3,954.32
Repairs
2,294.57
5,091.29
6,417.08
1,422.16
Other Expenses
4,237.04
3,313.45
4,356.02
3,343.78
Net Rental Income
(3,504.70)
(2,162.96)
(4,362.57)
2,578.65
Profit on Sale of House
143.00
143.00
143.00
Loss on Lumber
300.00
Adjusted Gross Income From All Sources
745.34
1,164.84
718.41
3,321.65
Tax Liability
31.00
74.00
7.00
264.77
For the year 1950 the petitioner, in computing the figure for adjusted gross income, took into account itemized deductions and the figure for adjusted gross income is, in reality, net income. For the years 1947, 1948, and 1949 the petitioner, in computing his tax, used the tax table which takes into account the standard deduction. The petitioner kept books in which he recorded receipts of rentals for the years 1947 through 1950. One of them, known as the green book, contained entries for 1947 and 1948 and some entries for 1949. Another, known as the black book, covers the years 1949 and 1950 and contains entries for later years. The rental receipts as shown by the petitioner in his returns for the years 1947, *36 1948, 1949, and 1950 substantially correspond with the rental receipts shown in these two books. In October 1950, a revenue agent commenced an investigation of the petitioner's tax returns for the years 1948 and 1949. Later the investigation was broadened to cover the years 1946, 1947, and 1950. The petitioner was asked to submit his records. He did submit certain work sheets which had been used in connection with the preparation of his returns for the years 1948, 1949, and 1950, but not for 1947. He also produced certain invoices, canceled checks, statements, and receipts in support of his business deductions for the years 1947, 1948, 1949, and 1950. The revenue agent, after examining the records submitted to him, advised the petitioner that the records were incomplete and asked for any other records which the petitioner had. The petitioner advised him that he paid most of his expenses in cash and, therefore, did not have complete records thereof. The revenue agent was furnished, in 1953, the black rental receipts book, but he was never furnished the green rental receipts book. The agent was not furnished a book on labor expenses or any inventory or summary of building materials on *37 hand. The invoices, canceled checks, etc., which were furnished by the petitioner to the agent corroborated the repairs claimed by the petitioner on his returns to the following extent: $1,205 for 1947, $4,132.56 for 1948, $2,134.37 for 1949, and $1,128.91 for 1950. However, some undisclosed amounts of these expenditures were of a capital nature. The petitioner did not maintain records substantiating his other claimed expenses. In December 1948, the petitioner purchased 100 shares of stock of Carolina Power & Light Company for $2,673.25, depositing in his bank account $2,700 in cash in order to make payment therefor. The petitioner had filed intangible personal property tax returns with the State of North Carolina for the years 1947 through 1950 and showed no cash on hand as of the end of any of those years. However, on June 11, 1953, the petitioner filed amendments to such returns and showed cash on hand as of the end of the years 1947 through 1950 in the amounts of $32,000, $23,000, $14,000, and $23,000, respectively, and paid the tax thereon. An official of the state intangible property tax division with whom he discussed the amendments, advised the petitioner that since 1937 the *38 law had required the payment of a tax on cash, and asked the petitioner whether he had any cash on hand for any previous years. The petitioner told this official that he did not have any cash in previous years. At all times prior to 1952 the petitioner prepared his own income tax returns, sometimes with advice from internal revenue personnel. In 1949 the United States District Court for the Eastern District of North Carolina, in a civil action brought by the Office of the Housing Expediter, held that the petitioner had violated the Housing and Rent Control Act in that he charged rents in excess of the legal maximum rent allowed, but held that the excess charges made by the petitioner were not willful in that all excess charges had been approved by the order of the Area Rent Director. The court further held that the tenants were not entitled to restitution, and the petitioner was permanently enjoined from violation of the Housing and Rent Control Act of 1949. The petitioner paid the court costs. Up to January 1953, the revenue agent, working with a special agent, had investigated the case on a specific adjustment basis. However, he then resorted to the net worth method and prepared, *39 about April or May 1953, a net worth schedule. In connection therewith the revenue agent investigated all leads given him. As a result of this investigation the respondent computed the petitioner's net income by the net worth method as follows: Assets
1- 1-47
12-31-47
12-31-48
12-31-49
12-31-50
Security National Bank
$ 92.28
$ 765.78
$ 327.70
$ 201.15
$ 754.06
Security Natl. Bk.-Bart F. Moore Acct.
1,868.47
First Federal Savings & Loan
3,993.00
Carolina Power & Light Stock
5,698.25
8,384.41
8,384.41
Accts. Receivable-Installment Notes
3,400.00
3,244.00
3,078.64
2,903.36
Real Estate
67,622.59
73,852.29
89,309.40
101,752.96
102,152.05
Houses Under Construction
5,000.00
3,000.00
15,000.00
Auto
500.00
500.00
500.00
3,138.76
3,138.76
Total Assets
$70,083.34
$83,518.07
$102,079.35
$116,555.92
$136,325.64
Liabilities
Security National Bank
$ 900.00
$ 900.00
$ 3,900.00
$ 5,650.00
$ 5,650.00
Durham Life Ins. Co.
16,073.98
15,281.10
14,451.77
13,584.35
12,677.24
Bart M. Gatling
700.00
700.00
700.00
700.00
700.00
First Federal Savings & Loan
11,250.00
Depreciation Reserve-Real Estate
13,359.65
15,512.26
18,578.68
22,227.26
26,139.91
Depreciation Reserve-Auto
235.41
549.29
Reserve for Unrealized Gain
2,533.53
2,417.29
2,294.07
2,163.46
Total Liabilities
$31,033.63
$34,926.89
$ 40,047.74
$ 44,691.09
$ 59,129.90
Net Worth
$39,049.71
$48,591.18
$ 62,031.61
$ 71,864.83
$ 77,195.74
Less Net Worth Prior Year
39,049.71
48,591.18
62,031.61
71,864.83
Increase of Net Worth
$ 9,541.47
$ 13,440.43
$ 9,833.22
$ 5,330.91
Liabilities
Adjustment to Net Worth Increase: Less: Nontaxable Government Pension
(2,598.72)
(2,598.72)
(2,598.72)
(2,598.72)
Nontaxable Portion of Capital Gain
(223.55)
(58.12)
(61.61)
(65.31)
Inheritance
(500.00)
Refund State Retirement
(416.00)
$ 6,719.20
$ 10,783.59
$ 6,256.89
$ 2,666.88
Add: Living and Personal Expenses
3,000.00
3,000.00
3,000.00
3,000.00
Adjusted Gross Income
$ 9,719.20
$ 13,783.59
$ 9,256.89
$ 5,666.88
Less: Standard Deduction
500.00
1,000.00
925.69
566.69
Correct Net Income
$ 9,219.20
$ 12,783.59
$ 8,331.20
$ 5,100.19
*40 All the items as determined by the respondent in the above computation are correct except as specifically found hereinafter. Cash on Hand The petitioner had cash on hand at January 1, 1947, and at December 31 of each of the years 1947 through 1950, in the amount of $7,000. Houses under Construction Prior to 1947 petitioner purchased land now known as 1306 (also known as 1302) East Hargett Street in Raleigh. In 1947 he purchased land known as 1307 East Hargett Street. No construction was commenced on these lots in 1947, and the petitioner had no construction in progress at December 31, 1947. Commencing in 1948 he constructed two houses on these lots, and they were both completed in 1948, at a cost of $13,500, which was paid in cash. The petitioner had no houses under construction at December 31, 1948. In 1949 he began and completed construction of a house on a lot known as 1208 Gatling Street, which he had purchased in 1947. In 1949 he also commenced and completed construction of a house located on a lot known as 6 N. Pettigrew Street in Raleigh. These two houses cost $12,300, which the petitioner paid in cash. The petitioner had no houses under construction as of December 31, 1949. *41 At some time before June 1950 the petitioner started construction of four houses located at 1206, 1210 and 1212 Gatling Street and at 1212 E. Martin Street. Building permits were issued for construction of these houses in October 1950. The Martin Street house was being constructed for petitioner's brother James. The petitioner sometimes advanced funds for construction of his brother's house, but he reimbursed himself from amounts entrusted to him by his brother or from rental income from his brother's property which was being managed by the petitioner. The total cost of construction of the petitioner's three houses was $22,500. Construction was completed in 1951. The dates of the first applications for utilities were September 13, 14 and October 8, 1951, respectively. In 1950 the petitioner borrowed $11,250 at the First Federal Savings and Loan Association for use in construction of his three houses. As of December 31, 1950 the undrawn balance in the petitioner's favor in this account was $3,993. The petitioner drew checks in 1950 totaling $7,580.79 for construction of the four houses. Of this total amount $524 was identified as being for his brother's house. Some portion of the amount *42 represented by the other checks was also expended on his brother's house. In addition the petitioner expended approximately $1,800 in cash for labor in connection with his three houses. He also expended other cash in 1950 and 1951 in the construction of his three houses. As of December 31, 1950 the petitioner's three houses under construction had cost $10,000. Autos Petitioner in 1942 purchased a 1941 Chevrolet tudor sedan for $875, of which $676.58 was borrowed from the First Citizens Bank and Trust Company of Raleigh on September 23, 1942. The car was pledged as security and repayment of the loan was to be made in 12 monthly installments. The petitioner owned this car at January 1, 1947, and as of the end of each of the years 1947 and 1948. He traded it in April 1949 as part payment for a 1949 Buick Roadmaster automobile which cost $3,138.76. He was allowed a trade-in credit of $500 and the remainder, $2,638.76 was paid in cash. As of the end of each of the years 1949 and 1950, the petitioner owned this Buick automobile. Depreciation Reserves for Buick Automobile For Years 1949 and 1950 The Buick automobile above referred to had a life of 5 years. The petitioner used this car for *43 traveling between his residence and the State Highway Commission where he was employed until November 1949. The distance between the petitioner's residence and the Highway Commission was 1.7 miles. The petitioner also used this car for transportation to football games occasionally and to go bird hunting. He also used the car to some extent in transporting some construction materials in connection with construction of his houses in 1949 and 1950, for inspecting the houses, and for collecting rents. At times some of his business records were kept in his car. The greatest distance between the petitioner's residence and any of his rental houses was less than a mile. The petitioner's customary daily routine while employed by the North Carolina State Highway Commission until November 1949, and when he had houses under construction, was to drive in his car to a cafeteria for breakfast, then drive to the construction site of his houses, and then proceed to the State Highway Commission. At the lunch hour he would often go to the construction site and after work he would again return to the construction site. At times he would then go in his car to some building supply company and transport *44 materials to the construction site; he would then drive to a cafeteria for his evening meal, and then drive to his residence. Over the period from April 1949 to November 1950, the petitioner drove his car about 12,000 miles. During the years 1949 and 1950, 75 per cent of the use of the petitioner's car was for business purposes. The proper amounts representing reserves for depreciation on this car at December 31, 1949 and December 31, 1950, were $353.10 and $823.90, respectively. Living and Personal Expenses The petitioner is a bachelor. He has always lived conservatively. He does not smoke or drink and seldom attends social functions. His lobby is bird hunting, on which he spent approximately $200 a year in the years in question. He also attended football games occasionally. From the time petitioner returned to Raleigh in December 1946, until the death of his father in August 1950, he rented a room in his father's home for $20 per month. Thereafter he lived at his brother's home. During this period the petitioner generally ate only two meals per day. During the years in question he had other annual expenses, including at least $300 for premiums on three life insurance policies, $75 *45 for clothing, $75 for entertainment, and $20 for dues. He also had medical expenses, car expenses for his personal use, and made contributions to charities. The petitioner's living and personal expenses for each of the years 1947, 1948, 1949, and 1950 were $2,000 per year. Revised Net Worth Computation Giving effect to the foregoing, the correct computation of the petitioner's net income by the net worth method is as follows: ASSETS:
1- 1-47
12-31-47
12-31-48
12-31-49
12-31-50
Cash
$ 7,000.00
$ 7,000.00
$ 7,000.00
$ 7,000.00
$ 7,000.00
Security National Bank
92.28
765.78
327.70
201.15
754.06
Security Natl. Bank-Bart F. Moore Acct.
1,868.47
First Fed. Savings & Loan
3,993.00
Carolina Power & Light Stock
5,698.25
8,384.41
8,384.41
Accounts Receivable-Installment Notes
3,400.00
3,244.00
3,078.64
2,903.36
Loan Receivable from Father
2,119.87
Real Estate
67,622.59
73,852.29
89,309.40
101,752.96
102,152.05
Houses Under Construction
10,000.00
Auto
875.00
875.00
875.00
3,138.76
3,138.76
TOTAL ASSETS
$77,458.34
$85,893.07
$106,454.35
$123,555.92
$140,445.51
LIABILTIES: Security National Bank
$ 900.00
$ 900.00
$ 3,900.00
$ 5,650.00
$ 5,650.00
Durham Life Insurance Co.
16,073.98
15,281.10
14,451.77
13,584.35
12,677.24
Bart M. Gatling
700.00
700.00
700.00
700.00
700.00
First Fed. Savings & Loan
11,250.00
Depreciation Reserve-Real Estate
13,359.65
15,512.26
18,578.68
22,227.26
26,139.91
Depreciation Reserve-Auto
353.10
823.90
Reserve for Unrealized Gain
2,533.53
2,417.29
2,294.07
2,163.46
TOTAL LIABILITIES
$31,033.63
$34,926.89
$ 40,047.74
$ 44,808.78
$ 59,404.51
Net Worth
$46,424.71
$50,966.18
$ 66,406.61
$ 78,747.14
$ 81,041.00
Less Net Worth Prior Year
46,424.71
50,966.18
66,406.61
78,747.14
Increase in Net Worth
$ 4,541.47
$ 15,440.43
$ 12,340.53
$ 2,293.86
Adjustment to Net Worth Increase: Less: Nontaxable Gov't Pension
(2,598.72)
(2,598.72)
(2,598.72)
(2,598.72)
Nontaxable Portion of Cap. Gain
(223.55)
(58.12)
(61.61)
(65.31)
Inheritance
(500.00)
Refund State Retirement
(416.00)
$ 1,719.20
$ 12,783.59
$ 8,764.20
$ (370.17)
Add: Living & Personal Expenses
2,000.00
2,000.00
2,000.00
2,000.00
Adjusted Gross Income
$ 3,719.20
$ 14,783.59
$ 10,764.20
$ 1,629.83
Less: Standard Deduction
371.92
1,000.00
1,000.00
162.98
Correct Net Income
$ 3,347.28
$ 13,783.59
$ 9,764.20
$ 1,466.85
*46 Dependency Credits for 1950 The petitioner's father died on August 2, 1950. From April to August 1950, the petitioner expended $1,119.87 for groceries, medicine, and hospital bills for his father and mother. In that period the petitioner also deposited $1,000 in his father's bank account. On August 4, 1950, the petitioner was appointed executor of his father's estate and on August 15, the petitioner's sister filed a caveat to the will to determine the disposition of the personal property. On August 1, 1951, the petitioner filed with the Superior Court of Wake County an inventory of the assets and liabilities of his father's estate. Personal property was listed at $2,534.77, but real property consisting of 110 undeveloped lots was not valued. Liabilities were listed in an amount of $4,021.80, which included claims by the petitioner against the estate of "John Gatling Loan Deposit in Bank $1,000" and "John Gatling - Groceries, Medicine, Hospital $1,119.87." In September 1953, another inventory filed with the court listed the vacant lots at an estimated value of $75,000. The amount of $2,119.87 constituted a loan by the petitioner to his father in 1950. The petitioner's sister owned *47 the remainder interest in the house which in 1950 was occupied by the petitioner, his father and his mother. The petitioner's father was a lawyer and maintained an office in Raleigh. However, due to illness he did not actively practice in 1950. In 1950 the father received $25 per month as proceeds from the sale of a lot, $20 per month as rent from the petitioner, several hundred dollars as the executor of one estate, and an undisclosed sum as guardian of another estate. The petitioner's mother during the year 1950 received $30 per month from the rental of a house. In his return for 1950 the petitioner claimed three exemptions, which included two on account of his father and mother. In computing the deficiencies for the year 1950, the respondent allowed the petitioner only one exemption, rather than the three he had claimed. Additions to Tax Section 294(d)(1)(A) and (d)(2) The petitioner failed to file a declaration of estimated tax for the year 1950, and the respondent determined additions to tax pursuant to section 294(d)(1)(A) for failure to file a declaration of estimated tax and under section 294(d)(2) for substantial underestimation of estimated tax. The petitioner's failure *48 to file a declaration of estimated tax was not due to reasonable cause, but was due to willful neglect. Additions to Tax Under Section 293(b), and Statute of Limitations Some part of the deficiency for each of the years 1947, 1948, and 1949 is due to fraud with intent to evade tax. The return for each of the years 1947, 1948 and 1949 was false or fraudulent with intent to evade tax. Opinion Tax Liability for the Year 1946 The full amount of the tax liability computed by the respondent for 1946 (less a small amount of tax withheld) was determined by the respondent to be a deficiency in tax, his records indicating that no return was filed for that year. The respondent also determined an addition to tax under section 291(a) of the Internal Revenue Code of 1939, [2] *49 for failure to file a return, and an addition to tax on account of fraud, under section 293(b) of the Code. [3] There are two issues upon the merits of the tax liability. First, the petitioner contends that in addition to the deductions allowed by the respondent against rental income, which were paid out by his rental agent, he is also entitled to an amount of $397.50 which he expended for repairs on the houses and the cost of his trips from Washington to Raleigh, North Carolina, in connection with his properties. We agree that the petitioner is entitled to the amount which he himself expended for repairs, which we have found to be in the amount of $397.50. We have also found that he expended $300 in trips to North Carolina on business *50 and these likewise are allowable as deductions. The other point in issue is the amount of depreciation allowable on the rental properties. The petitioner contends that he is entitled to depreciation at a rate of 6 per cent, whereas the respondent allowed only 4 per cent. The respondent's determination is presumed to be correct and the burden of proof is upon the petitioner to prove the right to a greater allowance for depreciation. It was incumbent upon the petitioner to prove the useful life of the buildings. This he has not done. He stated that he had claimed depreciation at 6 per cent in his returns for 1943, 1944, and 1945. There was also evidence that the houses were from 30 to 35 years old when he acquired them and that they had not been properly maintained. However, this evidence does not establish what the useful life of the properties was. The only person who testified as to the length of useful life was Bart F. Moore. He did not qualify as an expert but stated that in January 1947, when he turned the management of the properties back to the petitioner, the remaining life would not be over 12 or 15 years if no repairs were made. The depreciation allowance takes into consideration *51 the making of necessary repairs and is granted to the taxpayer over and above the cost of ordinary repairs. We know from the record that from 1939 through November 1942, all of the rent received from houses totaling approximately $15,000 was spent in repairs or improvements. We also know that while Bart Moore managed the properties from 1942 through 1946 large amounts were expended for repairs and other expenses and that in addition thereto, in 1946, money was borrowed and approximately $1,900 was expended for improvements on some of the properties. All this evidence would tend to refute the contention that the properties were in such shape that they had as short a remaining useful life as claimed. In any event the petitioner has not shown that the respondent was in error in determining a useful life of 25 years for the buildings. The petitioner alleges error in the respondent's determination of the addition to tax for failure to file a return. He testified that in December 1946, as he was about to leave the Army, he went to the internal revenue office in Washington and that an employee or agent assisted him in preparing his return for the years 1943, 1944, 1945, and 1946. With respect *52 to the return for 1946, he stated that while at that time he did not have the latest statement from Bart F. Moore as to the rental income, he did have such statements for most of the year and that by projecting this income through the full year and taking depreciation at 6 per cent, the calculation showed no tax due. He stated that the agent accepted this calculation, that a return was prepared, that the agent put it in his basket, and that it was petitioner's understanding that it would be mailed by this employee to Baltimore after the beginning of the year 1947. In the first place, it would seem to be most unusual for an agent to assist in the preparation of a return before the year was complete or to accept such a return for mailing on behalf of the petitioner. The records of the respondent do not contain any indication that a return was filed. Furthermore, the petitioner, while producing at the hearing copies of the returns for 1943, 1944, 1945, could not produce a copy of a 1946 return. Upon this record we cannot find that a return was filed for the year 1946. Furthermore, under these circumstances we are not satisfied that the failure to file was due to reasonable cause and not *53 to willful neglect on the part of the petitioner. We accordingly approve the respondent's action in determining an addition to tax under section 291(a). With respect to the respondent's determination of an addition to tax for fraud for 1946, the burden of proof is upon the respondent. Section 1112 of the Internal Revenue Code of 1939, [4] *54 We think the respondent has not met his burden. The amount of the tax determined by the respondent was relatively small, amounting to $396, and this will be reduced in view of our holding with respect to additional deductions for repairs and expenses. Furthermore, the petitioner, apparently in good faith, believed that he was entitled to a greater rate of depreciation than 4 per cent. Had he been correct in this, the tax would not have been substantial. Under the circumstances, we think that it has not been established that any part of the deficiency is due to fraud with intent to evade tax. We therefore disapprove the respondent's determination of an addition to tax under section 293(b) for the year 1946. The petitioner's contention that assessment and collection of any tax for 1946 is barred by the statute of limitations is based upon the premise that a return was filed. We have held hereinabove that the petitioner has failed to show that he filed a return for 1946. Section 276(a) of the Code provides that in the case of a failure to file a return the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment at any time. We accordingly hold that assessment and collection of the tax for 1946 is not barred. Tax Liability for the Years 1947, 1948, 1949 and 1950 The respondent determined that the petitioner's books and records were inadequate for the determination of the petitioner's tax liability for the years 1947 through 1950, and therefore computed such tax liability upon the net worth method. The petitioner argues that it was improper to use the net worth method, contending that his books and records substantially record his income, that there is no evidence that petitioner's business operations could produce more income than was reported, and that *55 the respondent did not establish any other likely source of taxable income, citing Holland v. United States, 348 U.S. 121. The evidence shows that the records kept by the petitioner were not fully adequate to determine his tax liability resulting from the business operations disclosed in his returns. It developed at the trial that the petitioner did have two books purporting to list all his rental receipts for the years in question, but only one of such books was made available to the respondent's agents during the investigation. Furthermore, such records do not purport to cover all business expenses. But in any event, there are no conditions precedent to the utilization of the net worth method ( Davis v. Commissioner (C.A. 7), 239 F. 2d 187), and it may be used as evidence of correct net income even though the petitioner keeps books which on their face appear to be accurate. Holland v. United States, supra, Morris Lipsitz, 21 T.C. 917, affd. (C.A. 4) 220 F. 2d 871, certiorari denied 350 U.S. 845, William G. Lias, 24 T.C. 280, affd. (C.A. 4) 235 F. 2d 879, and Schwarzkopf v. Commissioner (C.A. 3), 246 F. 2d 731, affirming a Memorandum Opinion of this Court [15 TCM 762; *56 T.C. Memo. 1956-155]. Furthermore, in United States v. Massei, 355 U.S. 595, the Supreme Court made it abundantly clear that in a net worth case if all possible sources of non-taxable income are negatived, there is no necessity for proof of a likely source of taxable income. There can be no question that the respondent had the right to resort to the net worth method of computing the petitioner's taxable income. The petitioner has agreed to substantially all the items in the respondent's computation. However, he contends that such computation is in error in some respects, principally in not including among assets as of January 1, 1947, cash in an amount of at least $35,000. We have carefully considered all the contentions of the petitioner and have made certain adjustments to the respondent's computation in accordance with the proof. These will be discussed hereinafter. Cash on Hand In his net worth computation the respondent did not include as of the beginning of 1947 or as of the end of any of the years 1947 through 1950, any amount as cash on hand. The petitioner's contention is that as of January 1, 1947, he had as much as $35,000 in cash, which he claims accounts for the increases *57 in net worth over the years in question. In the computation of net income by the net worth method, it is of utmost importance that the opening net worth be established with reasonable accuracy in order properly to determine any subsequent increases in net worth. See Holland v. United States, supra. With one minor exception, the only item in opening net worth for 1947 which is questioned by the petitioner is the amount of cash. The petitioner testified that through the years he had accumulated cash, that he kept it in a trunk or suitcase in his room at his father's house, that later when he entered the Army in November 1942, he carried his cash with him in a suitcase, and that he continued to add to the cash while he was in the Army. Actually the petitioner does not know how much cash he had. He kept no permanent records of cash and testified that he never counted his money and did not know as of any particular date the exact amount he had. He arrived at an estimate of $35,000 of cash on hand at January 1, 1947, by calculating back from 1950. He testified that he knew he had approximately $23,000 in cash at the end of 1950, that by checking the amounts which he had expended against *58 the amounts which he had collected, he arrived at the conclusion that he had at least $12,000 more in cash on hand at the end of 1946 than at the end of 1950. However, in a sworn statement which he made in 1950 during the course of the investigation, he stated that he had less than $10,000 in cash as of December 31, 1950, this being subject to correction if the "records" should show otherwise. Thus, even within a year after December 31, 1950, the petitioner could not or would not state with any reasonable degree of exactitude how much cash he had on hand as of that date. The petitioner also introduced a witness at the trial who was an old friend and hunting companion and a person he had financially assisted, who testified that in January 1947, he called upon the petitioner at his residence, walked into the bedroom, and saw the petitioner counting his money. He said that he saw on the bed one stack of bills banded with a $10,000 band and 10 stacks banded with $1,000 bands and that also there were enough $100 bills to cover the bed like a sheet. He stated that it was his estimate that there must have been at least $35,000 on the bed at that time. Petitioner testified that he recalled *59 this occasion, that at the time he had $100 bills which he was putting into stacks of $1,000, but that he was not actually counting the total amount and could not state with precision how much he had at that time. We do not consider the testimony of this witness as sufficiently reliable to assist materially in determining the amount of cash on hand as of January 1, 1947. Nor can we accept the petitioner's estimate as being correct. Frankly, we cannot believe the petitioner kept as much as $35,000 in cash in a suitcase kept part of the time in his apartment in Washington occupied by transients, and part of the time in army barracks. He gave no explanation whatever of how he protected the suitcase against loss. Furthermore, he gave no satisfactory explanation of why he, an educated and experienced business man, engaged in security work for the Army, would choose to hoard such an amount of cash in this manner rather than keep it in the bank account which he maintained. We also note that in June 1953, which was shortly after the revenue agent resorted to the net worth method of computing the petitioner's tax liability, the petitioner amended his state intangible tax returns for the years *60 1947 through 1950 to show cash on hand as of the end of those years. He did not prepare a state return to show any cash on hand as of December 31, 1946, and a state tax official testified that petitioner told him that he had no cash in years prior to 1947. Admittedly the petitioner at January 1, 1947, had real estate which had cost $67,622.59, against which there were encumbrances of $16,073.98, which indicates actual investments by the petitioner in real estate of approximately $51,000 up to that time. If we were to accept the petitioner's claim that as of that time he also had $35,000 in cash, this would mean that the petitioner had been able to amass $86,000. Despite the fact that the petitioner lived frugally, we think he could not have saved that much, in the light of his financial history. Also, while it is recognized that the petitioner's state salary up to 1939 was not subject to Federal income tax, that $1,500 of his annual army pay was exempt from tax, and that in the years when he was dealing in stocks any gains would be taxable at varying amounts, depending upon the length of time the stock was held, we think the petitioner's record of lack of payments of Federal income *61 tax through the years, described in the Findings of Fact, indicates that he did not have sufficient income to have accumulated as much cash as he claims, in addition to his other property, at January 1, 1947. We have carefully considered all the evidence regarding the petitioner's financial history prior to January 1, 1947. Over the period from 1921 to 1942, the petitioner earned salary from the State of North Carolina totaling $41,047.40, an average of less than $1,900 per year. He also testified that he worked privately on occasions, and that he earned "quite a few thousand dollars in some years time." [5] *62 However, he had no record of such earnings and could recall only two specific instances as a result of which he earned a total of $950. We doubt that the amount so earned could have been substantial, since during the investigation he told the revenue agent that his only income from 1921 through 1946 consisted of his salary from the State Highway Commission, his salary while in the military service, and gains in the stock market. He also testified that he made some money in training and selling bird dogs, stating that "possibly" he made an average of $200 to $250 a year over "quite a period of time." From 1923 to 1941 the petitioner had some dealings in the stock market, but the brokerage records are not available for any year except 1941, in which year his brokerage account was closed out. He testified that in 1929 he lost between $2,000 and $2,500, but estimated that in some years he had gains amounting to about $2,000 or more. He stated that his credit balance in the brokerage account at one *63 time reached about $12,000 and at another time about $16,000, and that his largest withdrawals may have been in 1936 or 1937. However, his testimony was value, and consisted principally of generalties. He testified to only a few purchases of stocks and one purchase of wheat. The only definite evidence is the brokerage records for 1941, which show that upon closing the account the petitioner received a total of $1,655.65. The record as a whole indicates that at the time the petitioner went into the Army in November 1942, he could not have had very much cash. In an financial statement furnished the Security National Bank in February 1942, he listed real estate at $39,000, against which there were mortgages of $13,000. This would indicate that by that time he had invested an amount of about $26,000 in realty. He testified that over the period from 1939 to 1942, he put $22,000 of his own money in the construction, purchase, and improvement of rental properties. In that period he received about $15,000 in rentals, which he testified was put into the rental properties either as permanent improvements or repairs. In the sworn statements above referred to, given to the respondent's agent in *64 1951, the petitioner represented that his cash at December 31, 1938, may have been as little as $10,000. The evidence indicates that the purchase of his equity in real estate up to 1942, and the expenditures for repairs and improvements, had substantially exhausted any savings he had up to that time, including his rental income. This conclusion is fortified by the fact that in 1941 and 1942 the petitioner borrowed money from banks (aside from his mortgages) upon which he paid interest. We think it quite unlikely that the petitioner would borrow money and pay interest thereon if he had a hoard of cash lying idle. See Anderson v. Commissioner (C.A. 5), 250 F. 2d 242, affirming a Memorandum Opinion of this Court [15 TCM 922; T.C. Memo. 1956-178]. Financial statements given to the bank in 1941 and 1942 would indicate that he did not have cash on hand and in banks in an amount of over $500. Thus, although the petitioner testified that when he went into the Army in 1942, he carried some cash in a suitcase, we think the amount could not have been substantial. Furthermore, his explanation of why he carried cash in his suitcase is far from persuasive. He said he carried the cash in order *65 to take advantage of dips in the stock market while he was in the Army. This, of course, could have been accomplished by use of his checking account. The evidence shows that he did not have any dealings in the stock market during the time he was in the Army. Accordingly, it is our conclusion that any cash which the petitioner may have had on hand at January 1, 1947, would consist principally of money he had saved while he was in the Army. While in the Army from November 1942 to December 1946, the petitioner's yearly salary and allowances average about $3,700, or a total of about $15,000. He deposited his Government checks in his bank account in Raleigh. The balance in this account at December 31, 1946, was $92.28. He claims that he continued to add to the cash in his suitcase during this period, and that the suitcase contained at least $35,000 when he left the Army. His explanation was that other Army personnel paid him for staying in his apartment for short periods, that he was reimbursed for whiskey and food which he bought for others for parties, and that this money was put into the suitcase. Petitioner makes no claim that any rental income was paid over to him by his rental agent *66 Moore. Indeed the evidence affirmatively shows that not until some time in January 1947, did Moore make any distribution to him. The petitioner testified that the apartment he occupied in Washington in 1946 cost him $54 per month, and that he ate some of his meals inexpensively at the Pentagon. We do not know how much his living quarters cost him while in Washington prior to 1946. He estimated that $600 would amply cover his yearly cost of living while in Washington. To us this is incredible. We think that even if others did help pay for his rent, and even though Moore, his rental agent, paid some personal expenses for him in those years, the cost to him of his personal and living expenses while in war-time Washington would have been far in excess of $600 per year. Based upon the whole record, and exercising our best judgment, we have concluded and have found as a fact that as of January 1, 1947, the petitioner had cash in the amount of $7,000. It is also necessary in a net worth computation to determine the amount of cash on hand as of the end of each year. Otherwise the computation of increases in net worth cannot be accurate. We are satisfied that the petitioner did keep substantial *67 cash on hand throughout the years with which we are concerned. His sworn statement, above referred to, would indicate that as of December 31, 1950, he had an amount approaching $10,000, and, of course, he testified flatly he thought he had as much as $23,000 as of that date. As indicated above, we think these estimates are not reliable, but they do indicate that the petitioner did have substantial cash. Furthermore, we know that the petitioner in the various years made cash expenditures in large amounts. In 1948 he constructed two houses at a cost of $13,500, two houses in 1949 at a cost of $12,300, and three houses were begun in 1950 and completed in 1951 at a cost of $22,500, of which only $11,250 was borrowed. We also know that the petitioner's bank accounts at the various year-ends show little cash carried in the bank, and the petitioner's testimony is to the effect that he generally paid cash for these houses. In addition, in December 1948, the petitioner deposited $2,700 in cash in order to purchase shares of stock of Carolina Power & Light Company and in April 1949 he bought a Buick automobile, paying $2,638.76 in cash for it. Under these circumstances, we have exercised our *68 best judgment and have concluded that as of the end of each of the years 1947 through 1950, the petitioner had at least $7,000 in cash. Accordingly, we have found as a fact that he did have $7,000 in cash at such times and we have included that figure in the revised net worth computation. Houses under Construction The respondent held that the petitioner had houses under construction at a cost of $5,000 as of December 31, 1947. The petitioner disputes this. He testified that in 1947 and probably at the end of that year he was in the process of making improvements to certain existing houses at a cost of about $5,000. However, he stated that there was no new construction started in 1947. Two houses were completed in 1948 which the petitioner testified had taken about seven months to construct. The petitioner did not obtain permits for construction of these houses. The revenue agent testified that petitioner stated to him during the investigation that it took about a year to complete the construction of these houses. However, the petitioner did not purport to tell the agent the precise time of commencement of construction. In the light of the petitioner's testimony at the hearing, which *69 we consider plausible, we have concluded that there were no houses under construction at December 31, 1947. The respondent in determining the deficiency held that the petitioner had houses under construction at December 31, 1948, at a cost of $3,000. By amendment to his answer following the trial, the respondent alleged that the petitioner had no houses under construction at December 31, 1948. The petitioner on brief objects to this proposed change in respondent's net worth computation. However, the petitioner flatly testified that there was no construction under way at December 31, 1948. Accordingly, we have revised the net worth computation to eliminate $3,000 as cost of construction in process as of December 31, 1948. The parties are in agreement that there were no houses under construction at December 31, 1949. The respondent held that the petitioner had houses under construction as of the end of 1950 at a cost of $15,000. The cost of the houses in question when completed in 1951 was $22,500. The petitioner contends on brief that the amount he had invested in his three houses under construction as of December 31, 1950, was $8,233.93. The petitioner had made arrangements to borrow *70 from a savings and loan association one-half of the total cost of these houses, namely, $11,250. By the end of 1950 he had withdrawn $7,257. He claims that some of this money that he had withdrawn was used in constructing another house for his brother. He submitted checks purporting to represent all the cost of construction of his three houses and his brother's house in 1950. These totaled $7,580.79. Of this he specifically identified $524 as having been paid on his brother's house and he estimated that of the other amounts paid by check an amount of $1,372.86 was attributable to his brother's house. Thus, of the expenditures by check in 1950, he claims that $5,683.93 was expended for his own three houses. In addition petitioner concedes that he spent cash in the construction of his houses of which he has no record. He testified that he did not know precisely how much he had spent in cash on his three houses but estimated that he had spent $1,800 in cash for labor and an additional amount in cash which he thought could not have been as much as $2,000 and which might not have been as much as $1,000. The record is most unsatisfactory with respect to the amount which had been spent on *71 these houses by the end of 1950. This is due largely to the fact that the petitioner did not have records. The petitioner at the hearing merely guessed at or estimated the amount of cash he had spent. Furthermore, he did not know precisely how much of the money spent by check had been spent on his brother's house, but merely made an estimate. In this state of the record we have had to exercise our best judgment in determining how much had been spent on the petitioner's three houses and have concluded and found as a fact that this amounted to $10,000 as of December 31, 1950. Autos The respondent held that as of the beginning of the year 1947 and at the end of the years 1947 and 1948 the petitioner had an automobile which had cost $500. By amendment to his answer he conceded that the cost was greater, namely, $676.58. However, we are satisfied from the testimony that this car cost the petitioner $875 and we have included that figure in the revised net worth computation. Depreciation Reserves for Buick Automobile For Years 1949 and 1950 The parties are at odds as to the proper amounts to be included in the net worth computation as the reserve for depreciation on the petitioner's Buick *72 automobile as of the end of each of the years 1949 and 1950. The point of difference is the proportion of the depreciation which is to be attributed to business use. The respondent held that the car was used 50 per cent for business, whereas the petitioner contends that it was used 95 per cent of the time in carrying on his business. The expenses of going from one's residence to his place of business, commuting expenses, are personal and non-deductible. Frank H. Sullivan, 1 B.T.A. 93, Mort L. Bixler, 5 B.T.A. 1181, William L. Heuer, 32 T. C. - (July 23, 1959), and section 39.23(a)-2 of Regulations 118. The petitioner also used the car for other personal uses, such as attending football games and hunting. The petitioner does not have any records to show the extent of the use of the car for each purpose. We have exercised our best judgment and have concluded that for each of the years in question the car was used 75 per cent for business purposes. The depreciation on the car and the proper amounts of depreciation reserves have been computed upon this basis in our revision of the net worth computation. Living and Personal Expenses In determining the deficiencies the respondent added *73 to the increase in net worth in each of the years 1947, 1948, 1949, and 1950 an amount of $3,000 as representing living and personal expenses. By amended answer he seeks to increase this figure for 1950 to $5,000 because of an amount of $2,119.87 which the petitioner claims he expended in support of his parents in that year. The petitioner on the other hand testified and contends that his living and personal expenses did not exceed $1,200 per year for any year except for the amount of $2,119.87 which he spent in 1950 for the support of his father and mother. We are satisfied that the petitioner lived frugally, but we cannot accept his estimate of $1,200 as representing his living and personal expenses for the years in question. This figure was an estimate, the petitioner not having kept records of his living and personal expenses. We have taken into consideration such evidence as we have of his living habits and such costs as have been shown as well as statements which the petitioner made during the investigation and certain expenditures shown on his returns. In the exercise of our best judgment, we have concluded and found as a fact that the petitioner's living and personal expenses *74 amounted to $2,000 for each of the years 1947 to 1950, inclusive. As will appear hereinafter, it is our conclusion that the amount of $2,119.87 was a loan to his parents. As such, it should properly be reflected as an asset as of December 31, 1950, and in our revision of the net worth computation we have so included it. Deficiencies in Tax For Years 1947, 1948, 1949 and 1950 Giving effect to the necessary corrections in the respondent's net worth computation, we have computed the correct adjusted gross income and net income, as set forth below, as compared with the adjusted gross income reported by the petitioner in his returns for the years in question: Correct
Adjusted
Adjusted
Correct
Gross In-
Gross In-
Net In-
come Per
Year
come
come
Returns
1947
$ 3,719.20
$ 3,347.28
$ 745.34
1948
14,783.59
13,783.59
1,164.84
1949
10,764.20
9,764.20
718.41
1950
1,629.83
1,466.85
3,321.65
As stated in our Findings of Fact, the petitioner's figure for adjusted gross income for 1950 is, in reality, net income. The petitioner, in computing his tax liability for the years 1947, 1948, and 1949 used the tax table which takes into account the standard deduction. Accordingly, for those years it may be considered that the petitioner's *75 reported net income would be approximately 10 per cent less than the figures set forth for adjusted gross income, or approximately $670, $1,050, and $650, respectively. It follows, therefore, that there will not be a deficiency for the year 1950. However, there will be substantial deficiencies for the years 1947, 1948, and 1949. Dependency Credits for 1950 In his 1950 return the petitioner claimed dependency credits under section 25(b) of the Internal Revenue Code of 1939, [6] *77 for his father and mother, which were disallowed by the respondent. The petitioner's claim is based upon the fact that from April to August 1950, he advanced $1,119.87 for groceries, medicine, and hospital bills for his parents and that during that year he deposited $1,000 in his father's bank account for his use. The father died in August 1950, and in August 1951, the petitioner as executor made claim against the estate for this total amount as loans to his father. The petitioner's explanation is that at the time the amounts were spent for his parents he did not intend to seek repayment, but after litigation arose he filed a claim against the estate in order to preserve at least this much of the estate. This *76 explanation is not persuasive. Included in the estate was a large amount of real estate which was valued at $75,000 and which the petitioner testified had an even greater value. It appears that the caveat filed by the petitioner's sister concerned only the personal property, which was in a relatively small amount. It further appears that the claims against the estate were all in relatively small amounts. Furthermore, the evidence shows that in 1950 the petitioner's father and mother did have some income. From all these circumstances, we have concluded and have found as a fact that the $2,119.87 constituted a loan by the petitioner in 1950 to his father. Accordingly, the petitioner's claim for dependency credits based upon this expenditure must fall. Furthermore, there are additional reasons why the petitioner's claim for dependency credits would have to be disallowed. He has failed to show the total cost of support of his parents and has also failed to show that they did not each have gross income in excess of $600. Upon this issue we approve the respondent's determination. Additions to Tax Under Section 293(b) The respondent added to the deficiencies determined by him 50 per cent thereof pursuant to section 293(b) of the Internal Revenue Code of 1939, heretofore set forth in the margin, on the ground that some part of each deficiency for the years 1947 through 1950 was due to fraud with intent to evade tax. Section 1112 of the Internal Revenue Code of 1939, heretofore set forth in the margin, places the burden of proof upon the respondent in respect of the fraud issue. Fraud is never presumed but must be established by clear and convincing evidence. Shahadi v. Commissioner (C.A. 3) 266 F. 2d 495, *78 certiorari denied - U.S. - (October 26, 1959), Drieborg v. Commissioner (C.A. 6), 225 F. 2d 216, Davis v. Commissioner, supra, Arlette Coat Co., 14 T.C. 751, Frank Imburgia, 22 T.C. 1002. It is well established that a taxpayer's consistent and substantial understatement of income over a period of years may constitute clear and convincing evidence of fraud. Holland v. United States, supra, Lipsitz v. Commissioner, supra, Shahadi v. Commissioner, supra, Kashat v. Commissioner (C.A. 6), 229 F. 2d 282, Rogers v. Commissioner (C.A. 6), 111 F. 2d 987, Drieborg v. Commissioner, supra, Kurnick v. Commissioner (C.A. 6), 232 F. 2d 678, Schwarzkopf v. Commissioner, supra, Epstein v. United States (C.A. 6), 246 F. 2d 563, certiorari denied 355 U.S. 868, Jack M. Chesbro, 21 T.C. 123, affd. (C.A. 2), 225 F. 2d 674, certiorari denied 350 U.S. 995, Arlette Coat Co., supra, and W. A. Shaw, 27 T.C. 561, affd. (C.A. 6), 252 F. 2d 681. The petitioner has agreed to all the items in the net worth computation except those specifically discussed and decided hereinabove. Upon all such controversial items we have made definite findings based upon the evidence presented. Of the controversial *79 items, the item of cash on hand is by far the most important. Both parties put in proof in an attempt to show the cash on hand. Based upon the record, we are satisfied that as of January 1, 1947, the petitioner did not have more than $7,000 in cash, and that as of the end of each of the years 1947 through 1950 the petitioner had at least $7,000 in cash. Our reasons for so concluding have been set forth hereinbefore in some detail. The reconstruction of the net worth computation, which is based entirely upon items either admitted by the parties or found by us upon the basis of the evidence presented, discloses that the correct net income for each of the years 1947, 1948, and 1949 is many times the amount of net income reported by the petitioner in his returns for those years. We are satisfied that such relatively large understatements of net income by the petitioner, whether due to underreporting of income from disclosed sources or from undisclosed sources or from overstating deductions, could not have been due to inadvertance, carelessness, or ignorance. Based upon the whole record, we are satisfied that the respondent has met his burden of proof that some part of the deficiency for *80 each of the years 1947, 1948, and 1949 was due to fraud with intent to evade tax, and we have so found as a fact. In so finding, we have not relied to any extent upon any presumption in favor of the respondent's determination of deficiencies in tax. Proper additions to tax under section 293(b) will be computed under Rule 50. There is no deficiency in tax for 1950, and, of course, no addition to tax under section 293(b) for that year. Statute of Limitations The pleadings raise the issue of the statute of limitations for all years. However, by stipulation the parties in effect have agreed that due to the filing of consents in writing, assessment and collection of any deficiencies and additions for 1949 and 1950 are not barred. We have held that the returns for the years 1947 and 1948 were false or fraudulent with intent to evade tax. Consequently, under section 276(b) of the Internal Revenue Code of 1939, [7] *81 assessment and collection of the tax and additions for those years are not barred by the statute of limitations. Additions to Tax Section 294(d)(1)(A) and Section 294(d)(2)
The petitioner failed to file a declaration of estimated tax for 1950, and the respondent determined additions to tax under section 294(d)(1)(A), [8] *82 and under section 294(d)(2) for substantial underestimation of estimated tax. Although our computation of the petitioner's net income for 1950 results in a holding of no deficiency, the fact remains that there was some tax liability for 1950. Section 58 of the Internal Revenue Code of 1939[9] provides for the filing of a declaration of estimated tax, and the addition to tax provided in section 294(d)(1)(A) must be approved unless the petitioner's failure to file was due to reasonable cause and not to willful neglect. Petitioner did not testify as to his reason for failure to file a declaration of estimated tax. However, on brief he argues that in view of the fact that his real estate operations over prior years had resulted in losses, he had reason to believe that he would not have any taxable income for 1950, and hence had reasonable cause for failure to file a declaration of estimated tax. This argument is without merit. In his return for 1950 he showed a profit on real estate operations, and pursuant to section 58(d) he was required to file a declaration of estimated tax in any quarter of the year in which it appeared that he would have gross income in excess of $600 per year. The proper amount *83 of addition to tax under section 294(d)(1)(A) will be computed under Rule 50. In Acker v. United States - U.S. - (November 16, 1959), the Supreme Court held that section 294(d)(2) *84 does not authorize the treatment of a taxpayer's failure to file a declaration of estimated tax as the equivalent of a declaration estimating his tax to be zero, and that in the case of a failure to file there is no addition to tax under that section. Decision will be entered under Rule 50. Footnotes
1. It may be that Moore paid off some of petitioner's mortgages, since the interest which he paid out as agent in 1946 was only about $800, whereas in 1943, 1944 and 1945, the interest paid out averaged about $1,200 yearly.
2. SEC. 291. FAILURE TO FILE RETURN. (a) In case of any failure to make and file return required by this chapter, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the tax: 5 per centum if the failure is for not more than thirty days with an additional 5 per centum for each additional thirty days or fraction thereof during which such failure continues, not exceeding 25 per centum in the aggregate. * * * 3. Section 293(b) provides: (b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2).↩
4. SEC. 1112. BURDEN OF PROOF IN FRAUD CASES. In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Commissioner.
5. Petitioner's testimony regarding this parttime work was as follows: Q. Would you have an estimate as to what you earned during the years per year from 1921 through 1939 or 40, how long - how long did you do it? A. We did the first work plans for various structures for the contractor, for which we were paid for working at night. How much I earned over a total period of years is rather difficult. I would say quite a few thousand dollars in some years time. Q. What do you mean by quite a few thousand? Thirty thousand? A. Oh, it could have been - it could have possibly been as much as $70,000 or $80,000. Q. Did you say it could possibly have been as much as seven or eight or could not have been? A. I said it possibly could have been. I really don't know. I am estimating now.↩
6. SEC. 25. CREDITS OF INDIVIDUAL AGAINST NET INCOME. * * *
(b) Credits for Both Normal Tax and Surtax. - (1) Credits. - There shall be allowed for the purposes of both the normal tax and the surtax, the following credits against net income: * * *
(D) An exemption of $600 for each dependent whose gross income for the calendar year in which the taxable year of the taxpayer begins is less than $600 * * *
(3) Definition of dependent. - As used in this chapter the term "dependent' means any of the following persons over half of whose support for the calendar year in which the taxable year of the taxpayer begins, was received from the taxpayer: * * *
(D) the father or mother of the taxpayer * * *.↩
7. (b) Waiver. - Where before the expiration of the time prescribed in section 275 for the assessment of the tax, both the Commissioner and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.
8. SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT. * * *
(d) Estimated Tax. - (1) Failure to file declaration or pay installment of estimated tax. - (A) Failure to file declaration. - In the case of a failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is shown to the satisfaction of the Commissioner to be due to reasonable cause and not to willful neglect, there shall be added to the tax 5 per centum of each installment due but unpaid, and in addition, with respect to each such installment due but unpaid, 1 per centum of the unpaid amount thereof for each month (except the first) or fraction thereof during which such amount remains unpaid. * * *↩
9. SEC. 58. DECLARATION OF ESTIMATED TAX BY INDIVIDUALS. (a) Requirement of Declaration. - Every individual * * * shall, at the time prescribed in subsection (d), make a declaration of his estimated tax for the taxable year if - * * *
(2) his gross income from sources other than wages * * * can reasonably be expected to exceed $100 for the taxable year and his gross income to be $600 or more. * * *
(d) Time and Place for Fling. - (1) In general. - The declaration required under subsection (a) shall be filed on or before March 15 of the taxable year, except that if the requirements of section 58(a) are first met (A) after March 1 and before June 2 of the taxable year, the declaration shall be filed on or before June 15 of the taxable year, or (B) after June 1 and before September 2 of the taxable year, the declaration shall be filed on or before September 15 of the taxable year, or (C) after September 1 of the taxable year, the declaration shall be filed on or before January 15 of the succeeding taxable year.↩