Carmine Bollella and Teresa Bollella v. Commissioner.
Bollella v. Commissioner
Docket No. 2497-63.
United States Tax Court
T.C. Memo 1965-162; 1965 Tax Ct. Memo LEXIS 168; 24 T.C.M. (CCH) 858; T.C.M. (RIA) 65162; June 18, 1965
*168 The petitioners in the conduct of their grocery business did not keep adequate books and records for the taxable years 1956 through 1959, but did keep correct records for the years 1960 and 1961. The respondent reconstructed the petitioners' gross profit from the operation of the business for the years 1956 through 1959 upon the basis of the petitioners' experience during the taxable years 1960 and 1961, determining that gross profit was substantially understated in the income tax returns for each of the taxable years 1956 through 1959. Held, that the respondent's method of reconstructing the total purchases, total sales, and gross profit from the business was reasonable. Held, further, that the petitioners have not shown error in the respondent's action in increasing the gross profit for the years in question on account of merchandise withdrawn from the business for personal consumption by the petitioners and the families of their two sons. Held, further, that some part of the underpayment in tax for each of the taxable years 1956 through 1959 was due to fraud and that the petitioners are liable for additions to tax on account thereof. Anthony L. Lutomski, Guardian Bldg., Detroit, *169 Mich., for the petitioners. Ronald S. Supena, for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax, and additions to the tax under section 6653(b) of the Internal Revenue Code of 1954, for the taxable years and in amounts as follows: Additions to
Taxable
Tax Under
Year
Deficiency
Section 6653
1956
$ 4,409.24
$ 2,204.62
1957
8,484.89
4,242.45
1958
9,815.20
4,907.60
1959
2,228.70
1,114.35
1961
981.50
$25,919.53
$12,469.02 The issues are: (1) whether petitioners understated their taxable income from the operation of a grocery store in each of the taxable years 1956, 1957, 1958, 1959, and 1961; and (2) whether any part of any underpayment of tax for any of the years 1956 through 1959 is due to fraud. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. The petitioners are husband and wife residing in Detroit, Michigan. For each of the taxable years 1956 through 1961 they filed a joint income tax return with the district director of internal revenue at Detroit, Michigan. Teresa Bollella is a petitioner only by reason of having filed joint returns with her husband and hereinafter *170 Carmine Bollella will be referred to as the petitioner. Petitioner, a citizen of the United States, was born in Italy. His formal education was limited to one year. He came to the United States about 1910, at the age of 15, and began working as a water boy for a motor company. In 1930 he began selling fruit as a street vendor. In 1941, he purchased, for $3,000, a retail grocery business in Detroit known as the A. & E. Market (hereinafter referred to as the store). Since that time, and up until the time of trial, he has owned and operated this business. His wife did not participate in the conduct of the business. For several years following 1941 petitioner, with the help of his daughter, purchased whatever merchandise was needed. In 1949 petitioner's son, Oswald, began to help his father in the management of the business. Petitioner's other son works full time at the store and, in addition, petitioner employs cashiers. During the years in question, and thereafter, petitioner went down to the store every day, made whatever purchases were necessary, worked for three or four hours, and then went home. In the years in question, petitioner's son Oswald was manager of the store and either *171 Oswald or his brother collected the day's receipts at the close of business. A checking account was maintained for the business and receipts therefrom were deposited in such account weekly. Both the petitioner and Oswald were authorized to draw checks on this account, but Oswald customarily signed the checks, including those in payment of sales taxes and income taxes. Oswald maintained whatever books and records the store had, but for none of the years 1956 through 1959 were such records adequate to establish the amount of sales or purchases. For the years 1960 and 1961 Oswald maintained substantially correct records of purchases and sales made. For 1960 the petitioner's total sales amounted to cost plus 22% of cost, and for 1961 they amounted to cost plus 24% of cost. Under Michigan law, monthly sales tax returns were required to be filed by retail and wholesale businesses. Oswald prepared all such returns for the period 1956 through 1961, and the petitioner signed them. Oswald picked figures "out of the air" in preparing such sales tax returns. In the latter part of 1959, the State of Michigan conducted an audit of petitioner's sales tax returns and found the books and records of *172 the business to be inadequate for the purpose of determining the sales tax due. For the period August through November 1959, Oswald and a State of Michigan auditor maintained a daily record of all purchases and sales. It was found that 40.78% of the purchases made in that period were made from 4 grocery suppliers who kept complete records of purchases made by the petitioner. Such auditor determined the volume of purchases made by petitioner from such 4 suppliers in 1957 and 1958 and, upon the assumption that such purchases represented 40.78% of petitioner's total purchases, calculated such total purchases for the years 1957 and 1958. To the total so computed, he added a markup of 21% (representing an excess of selling price over cost of 18%, plus the 3% Michigan sales tax), which was agreed upon between him and Oswald as being reasonable. By this method gross sales for 1957 and 1958 were computed to be $474,048.21, which represented an increase of 114.06% over the sales reported in the sales tax returns for those years. This percentage was applied to the reported sales over the period July 1954 through November 30, 1959, which resulted in an aggregate deficiency in Michigan sales taxes *173 for the period of $20,604.60, to which the petitioner and Oswald agreed. Throughout the course of his audit the state auditor dealt primarily with Oswald, but on some occasions the petitioner was present. The petitioner paid such deficiency in February 1960 with $10,000 of cash which he had on hand and $10,604.60 which he borrowed. In July 1961 an agent of the respondent began an audit of the petitioner's books for the taxable year 1959. Oswald presented to the agent certain Michigan business activities and sales tax returns, certain employment tax returns, a bank deposit book, and a ledger. The agent asked for supporting documents, namely, purchase and sales records and expense records, but none was furnished him. The agent examined the petitioner's records relating to the operation of the business for the taxable years 1960 and 1961. He contacted the petitioner's suppliers and determined that the petitioner's records for those two years were substantially correct. He then contacted the suppliers to determine the amount of purchases made by the petitioner for all the years 1956 through 1959. He found that some of the suppliers were able to furnish the desired information and others *174 were not, either because they had destroyed the records for earlier years or because the purchases represented cash sales of which no detailed records had been kept. He found, however, that 7 of the suppliers [1] who had furnished approximately 50% of the petitioner's total purchases for the years 1960 and 1961 had records of supplies furnished the petitioner for the years 1956 through 1959. The agent concluded that the total purchases made by the petitioner from the 7 suppliers in each of the years 1956 through 1959 constituted 50% of the petitioner's total purchases for those years (as in 1960 and 1961) and in that manner computed the petitioner's total purchases for each of those years. In order to arrive at the amount of sales for those years, he added to the computed cost of goods sold a markup of 23% of such cost (including 3% Michigan sales tax) which was the average excess of petitioner's total sales over cost of goods for the years 1960 and 1961. At some undisclosed time, the petitioner's counsel voluntarily presented *175 to the revenue agent a statement purporting to show the petitioner's net worth during the years in question. The agent requested that the petitioner verify certain of the items contained therein, including cash on hand and cost of living, but such verification was not furnished, other than the fact that in February 1960 the petitioner paid $10,000 of sales tax in cash. During the years 1956 through 1961, the petitioner, in the operation of the business, made purchases in the following amounts from the following listed suppliers: Purchases Made for the Years 1956
Through 1961
Name of Supplier
1956
1957
1958
Lee and Cady
$ 42,272.85
$ 50,552.07
$ 53,366.37
Arthur A. Anderson
8,747.91
9,895.00
11,780.73
Cherrin Bros.
1,794.41
1,523.30
1,821.03
Land O'Lakes Creameries
7,749.26
6,787.02
3,520.14
Theodore T. Miloch & Son
18,000.00
19,415.68
17,774.95
Anthony Raptis
11,499.30
8,046.97
17,667.97
Borden Company *
10,000.00
11,505.90
18,871.78
Stroh Brewing Company
3,130.35
3,166.90
5,056.00
Drewry's Ltd. USA, Inc.
$ 407.90
$ 362.50
$ 439.65
Seven-Up Bottling Co. of Detroit
350.00
376.25
355.00
Central Distributing Co.
1,268.50
613.75
1,039.20
Leone and Son
214.00
72.65
164.20
Total
$105,434.48
$112,317.99
$131,857.02
* Petitioner received rebates from the
Borden Milk Company in the following
amounts:
Purchases Made for the Years 1956
Through 1961
Name of Supplier
1959
1960
1961
Lee and Cady
$ 41,913.05
$ 54,394.15
$ 59,623.17
Arthur A. Anderson
12,927.43
14,081.94
14,357.64
Cherrin Bros.
1,293.55
1,176.40
1,305.14
Land O'Lakes Creameries
2,776.09
2,539.60
4,092.25
Theodore T. Miloch & Son
17,349.44
19,805.05
21,638.38
Anthony Raptis
12,842.56
11,002.02
3,008.46
Borden Company *
19,051.84
21,162.95
30,293.53
Stroh Brewing Company
7,755.60
7,309.70
7,537.10
Drewry's Ltd. USA, Inc.
$ 1,031.60
$ 1,216.10
$ 1,039.82
Seven-Up Bottling Co. of Detroit
461.45
501.85
958.20
Central Distributing Co.
1,138.20
711.60
1,015.00
Leone and Son
61.70
142.15
263.65
Total
$118,602.51
$134,043.51
$145,132.34
1957
1958
1959
* Petitioner received rebates from the
$1,132.48
$1,387.18
$2,151.18
Borden Milk Company in the following
amounts:
*176 In addition to the suppliers set forth above, petitioner, in the operation of the market, made purchases during the years 1956 through 1961 in undisclosed amounts from the following companies: Altes Brewing Company
National Biscuit Company Western E. & B. Distributing Company E. & B. Brewing Company
Jim O'Donnell, Inc. Anheuser-Busch, Inc. Pfeiffer Brewing Company DetroitCoca-Cola Bottling Company Squirt Detroit Bottling Company Stempien Beverage Company LaSalle Wines and Champagne, Inc. Pepsi-Cola Bottling Company of Detroit, Inc. Wolpin Company Feigenson Bros. Company Double-Cola Bottling Company Vernor's Ginger Ale, Inc. Sealtest Foods, Division of National Dairy Products Corp.
The petitioners' income tax returns for the years 1956 through 1961 were prepared by a bookkeeper and were based in part upon the Michigan sales tax returns and in part upon figures furnished by Oswald. The figures given by Oswald for purchases during the years 1956 through 1959 were picked by him "out of the air." For the years 1960 and 1961, the books and records were substantially correct and the amounts reported as purchases and sales on the income tax returns for those *177 years reflect the correct amount of purchases and sales. The income tax return for each of the years 1956 through 1961 was signed by the petitioners. In such returns, the petitioners reported net profit from the operation of the business as follows: Gross
Cost of
Gross
Business
Net
Year
Sales
Goods Sold
Profit
Deductions
Profit
1956
$ 87,233.49
$ 57,253.69
$29,979.80
$25,826.85
$ 4,152.95
1957
104,113.54
75,638.02
28,475.52
23,240.12
5,235.40
1958
118,239.83
87,488.10
30,751.73
25,278.10
5,473.63
1959
237,018.46
199,168.19
37,850.27
27,962.24
9,888.03
1960
296,189.34
242,634.77
53,554.57
44,180.47
9,374.10
1961
342,110.84
275,907.05
66,203.79
53,812.98
12,390.81
In the notice of deficiency the respondent, in computing the gross profit of the business for the taxable years 1956 through 1959, computed the cost of merchandise purchased in the manner employed by the revenue agent as described above, but for 1961 accepted the amounts reported in the return as the cost of merchandise purchased. For each of the years in question he used, in arriving at the cost of goods sold, the inventories as of the beginning and end of each year as reported by the petitioners in their returns. He used the sales price of goods sold in 1961 as reported *178 by the petitioners. However, for the years 1956 through 1959 he calculated the sales price of goods sold by using an average markup of 23% of cost, stating that the books and records for those years were inadequate. By this method he arrived at increases in gross profit for the years 1956 through 1959 over the amounts shown by the petitioners in the return, as shown in the following table: 1956
1957
1958
1959
Corrected purchases
$200,327.22
$215,433.88
$249,561.74
$216,307.92
Inventories - Increase or
(1,412.55)
211.50
(1,409.10)
(4,170.64)
Decrease
Corrected cost of goods
$198,914.67
$215,645.38
$248,152.64
$212,137.28
sold
Average mark-up of cost
of goods sold - 23%
Sales including sales tax
$244,665.04
$265,243.82
$305,227.75
$260,928.85
Add: Rebates from Borden
no record
1,132.48
1,887.18
2,151.18
Milk Co.
$244,665.04
$266,376.30
$307,114.93
$263,080.03
Less: Corrected purchases
200,327.22
215,433.88
249,561.74
216,307.92
above
Balance
$ 44,337.82
$ 50,942.42
$ 57,553.19
$ 46,772.11
Reflect: Increase or
(1,412.55)
211.50
(1,409.10)
(4,170.64)
Decrease in Inventories
Corrected gross profit
$ 42,925.27
$ 51,153.92
$ 56,144.09
$ 42,601.47
Gross profit per return
29,979.80
28,475.52
30,751.73
37,850.27
Increase in gross profit
$ 12,945.47
$ 22,678.40
$ 25,392.36
$ 4,751.20
*179 The respondent determined that in each of the years 1956 through 1959 and in the year 1961 there had been withdrawn from the business merchandise in the amount of $3,484 for personal consumption by the petitioners and the families of their two sons. He accordingly increased taxable income for each of such years by that amount, in addition to the increases shown in the above tabulation. The respondent further determined that all or part of the deficiency for each of the taxable years 1956 through 1959 was due to fraud, and accordingly he determined a 50% addition to tax for each of those years under section 6653(b) of the Internal Revenue Code of 1954. At least a part of the underpayment in tax for each of the taxable years 1956 through 1959 was due to fraud. Opinion The petitioners concede that their books and records for the taxable years 1956 through 1959 were inadequate for the computation of profits derived from their grocery business and that the respondent has authority to reconstruct the profit therefrom. However, they object to the method of computation used by the respondent, contending that he should have used the "more adequate" net worth method, or at least should have *180 supplemented the method which he did use by a net worth analysis which they submitted to him. It is well established that if no books and records are kept or if those kept are inadequate, the respondent may resort to all legal evidence available in determining the taxpayer's correct taxable income. The respondent is not restricted to any particular method of reconstruction. It is enough that in logic and in the light of normal business experience the method used provides a fair and rational measure of income. United States v. Johnson, 319 U.S. 503; Schira v. Commissioner, (C.A. 6) 240 F. 2d 672; Herbert Schellenbarg, 31 T.C. 1269, affd. on this issue (C.A. 6) 283 F. 2d 871; and Hyman B. Stone, 22 T.C. 893. In our opinion the method employed by the respondent was reasonable. The respondent's agent examined the petitioner's records for 1960 and 1961, contacted petitioner's suppliers and determined that the petitioner's records for those two years were substantially correct. He found, and the petitioners agree, that 7 major suppliers furnished petitioner about 50% of his total purchases of merchandise for those years. These 7 had records showing the amount of merchandise sold to *181 the petitioner in the years 1956 through 1959. Other suppliers for 1960 and 1961 did not have records for the prior years. The respondent, in reconstructing the business income, determined, on the basis of the 1960 and 1961 experience, that the merchandise sold by these 7 to the petitioner in the years 1956 through 1959 constituted 50% of the petitioner's total purchases for those years, and in this manner computed the amount of purchases in the years 1956 through 1959. The average excess of petitioner's total sales over the cost of goods in 1960 and 1961 was 23%, and the respondent used the same percentage of markup in determining the total sales for each of the years 1956 through 1959. Under the circumstances of this case, we think the respondent's method of determining the amount of purchases and sales and gross profit was reasonable. [2] See Harvey v. Early, (C.A. 4) 189 F. 2d 169; an Hyman B. Stone, supra.In this connection, it should be pointed out that the petitioners submitted in evidence a net worth computation, which they had previously submitted to the respondent, for the purpose of showing that the respondent's method was unreasonable. However, such computation fails in *182 its purpose since the petitioners did not introduce any evidence to show the correctness of the items contained therein. The respondent also increased gross profit from the business for each of the taxable years 1956 through 1959 and 1961 in the amount of $3,484 which he determined represented the amount of merchandise withdrawn from the business for the personal use of the petitioners and the families of their two sons. On brief the petitioners concede that in computing the profit derived from the business the total purchases should be reduced or total sales increased by the cost of the merchandise withdrawn by them. [3] However, they claim that the amount thereof as determined by the respondent for each year is excessive. They *183 also appear to concede that merchandise may have been withdrawn for the personal use of the families of their two sons, but contend that they should not be held accountable for such withdrawals. We think it clear, however, that such withdrawals, either by the petitioners or by their sons, for personal consumption, must be taken into account in computing the petitioners' taxable income from the operation of the business. The petitioners have submitted no evidence whatever to show that the three families did not withdraw each year merchandise of a cost of as much as $3,484, and have therefore not shown error in the respondent's determination in this respect. See Welch v. Helvering, 290 U.S. 111 and Doll v. Glenn, (C.A. 6) 231 F. 2d 186. The respondent also determined that all or part of the deficiency in tax for each of the taxable years 1956 through 1959 was due to fraud and determined that the petitioners are liable for the 50% addition to tax prescribed by section 6653(b) of the Internal Revenue Code of 1954. [4] The burden of proof is upon the respondent to prove fraud. [5] *185 Fraud is never presumed but must be shown by clear and convincing evidence. Arlette Coat Co., 14 T.C. 751; *184 Kashat v. Commissioner, (C.A. 6) 229 F. 2d 282; and Schira v. Commissioner, supra.Direct evidence of fraudulent intent is seldom available, and whether it exists must be determined from the conduct of the taxpayer and the surrounding circumstances. M. Rea Gano, 19 B.T.A. 518; Rogers v. Commissioner, (C.A. 6) 111 F. 2d 987; Lashells Estate v. Commissioner, (C.A. 6) 208 F. 2d 430; and Wickham v. Commissioner, (C.A. 8) 65 F. 2d 527. The evidence, including stipulated facts, establishes that substantial amounts of gross profits from the business were omitted from the returns for the taxable years 1956 through 1959. [6]
The petitioners admit that adequate records of purchases, sales, and gross profit were not kept for those years. The petitioners' son Oswald, who managed the business during the years in question, testified that the figures for merchandise purchased which he gave the bookkeeper for the purpose of preparing the petitioners' income tax returns for those years were picked by him "out of the air", and he admitted to the revenue agent during the investigation that the returns understated gross sales. The petitioners on brief contend, however, that the respondent has not met the *186 burden of showing that they intended to defraud the Government of taxes. They point out that the petitioner Teresa Bollella had nothing whatever to do with the business and contend that the petitioner Carmine did not know that the returns understated the profits from the business. In support thereof, they point out that the petitioner was an immigrant who had only a first grade education and no knowledge of bookkeeping, that his son Oswald managed the business, signed checks, received and deposited the business receipts, and was responsible for the preparation of the income tax returns. The petitioner testified that he did not know how much was taken in or expended in the business each day; that he did not know how much stock was taken in each week; that he never asked his son Oswald how much the store made; that the bookkeeper did not advise him as to the amount of income or the tax due thereon; and that he never intended to cheat the Government out of any income taxes. The petitioner came to this country in 1910 at the age of 15 and began working in a menial capacity. The evidence does not show his entire business career, but it does show that in 1930 he began selling fruit as a *187 street vendor and that in 1941 he purchased the grocery business for $3,000. For a number of years thereafter he apparently operated the business with only the help of his daughter. It was not until 1949 that his son Oswald began to help in the management of the business. The petitioner has always been active in the business, and during the years in question he went to the store every day and made whatever purchases were necessary, working 3 or 4 hours each day. Although he had little formal education, we are satisfied that he is intelligent and has considerable knowledge and ability as a business man. He testified that he was aware of the requirement for filing an income tax return each year, and, indeed, that he signed the returns. We think it inherently improbable that he did not in the years in question discuss with his son Oswald the profits of the business. He testified that he was "not surprised" when advised by his son Oswald in December 1959 that he, Oswald, had not been reporting the sales taxes properly. [7] *189 Oswald testified that he thought his father knew the sales were not being properly reported for sales tax purposes. [8] The revenue agent testified that he asked the petitioner *188 Carmine Bollella why the gross sales had been understated in the Federal income tax returns in 1959 and prior years and that the petitioner's son Oswald answered that the reason was that he did not want to pay the Michigan sales tax. Under the circumstances, we cannot agree with the contention that the petitioner did not know that the sales were understated in the income tax returns for the taxable years 1956 through 1959. Upon the basis of the whole record we believe that he was aware that the sales were understated for both sales tax and income tax purposes. Consistent failure to report substantial amounts of income over a number of years is effective evidence of a fraudulent intent to evade taxes. Holland v. United States, 348 U.S. 121; Rogers v. Commissioner, supra; Epstein v. United States, (C.A. 6) 246 F. 2d 563, certiorari denied 355 U.S. 868; Schwarzkopf v. Commissioner, (C.A. 3) 246 F. 2d 731; Bryan v. Commissioner, (C.A. 5) 209 F. 2d 822; and Anderson v. Commissioner, (C.A. 5) 250 F. 2d 242. In view of all the foregoing, we have concluded and have found as a fact that at least some part of the underpayment in tax for each of the taxable years 1956 through 1959 was due to fraud. In reaching this conclusion, we have not relied to any extent upon any presumption in favor of the correctness of the respondent's determination of deficiencies in tax. The respondent has shown by affirmative evidence that there are substantial deficiencies in tax for each of the years 1956 through 1959. Decision will be entered under Rule 50. Footnotes
1. These suppliers were: Lee and Cady; Arthur A. Anderson; Cherrin Bros.; Land O'Lakes Creameries; Theordore T. Miloch & Son; Anthony Raptis; and Borden Company.↩
*. See end of table for footnote.↩
2. It should be pointed out that the amounts of purchases made by the petitioner from the above referred to 7 suppliers in the years 1956 through 1959, as determined by the respondent, differ slightly from the stipulated purchases from such suppliers, with the result that the respondent's determination of purchases, sales, and gross profit from sales are not precisely correct. However, the proper computation can be arrived at in the recomputation under Rule 50.↩
3. See O.D. 998, 5 C.B. 86↩.
4. Section 6653 of the 1954 Code provides as follows: * * *
(b) Fraud. - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * (c) Definition of Underpayment - For purposes of this section, the term "underpayment" means - (1) Income, Estate, and Gift Taxes. - In the case of a tax to which section 6211 (relating to income, estate, and gift taxes) is applicable, a deficiency as defined in that section * * *. ↩
5. Section 7454 of the 1954 Code provides as follows: (a) Fraud. - In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary or his delegate.
6. The gross profits reported by the petitioners for the years 1956 through 1959 were approximately $30,000, $28,500, $31,000, and $37,850, respectively, whereas the correct gross profits (not taking into account the adjustment of $3,484 for each year for merchandise withdrawn for personal use) were approximately $43,000, $51,000, $56,000, and $42,600, respectively.↩
7. His testimony in this respect was as follows: Q. Your son Oswald, when he testified this morning, he stated in about January of 1960 or December of 1959, he told you that he had been not reporting the tax properly, the sales tax properly. A. Yes. Q. Did it surprise you when he stated that he had not been doing this right? A. No. Q. You weren't surprised by the fact? A. I didn't know nothing about those things. My education isn't good enough for that. Q. But it didn't surprise you when he told you that he was cheating on the taxes that you should be paying by the business? A. No, no. ↩
8. His testimony in this respect was as follows: Q. Did you ever tell your parents that you were not reporting the true figures on the sales tax returns? A. I guess they knew it.↩