**S. S. and Khyria KASHAT, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Nos. 12375, 12376.**

United States Court of Appeals
Sixth Circuit.

Jan. 18, 1956.

Edgar W. Pugh, Detroit, Mich., for petitioners.

John J. Kelley, Jr., Washington, D. C. (H. Brian Holland, Ellis N. Slack, Washington, D. C., on the brief), for respondent.

Before SIMONS, Chief Judge, and ALLEN and STEWART, Circuit Judges.

SIMONS, Chief Judge.

■■ The petitioners seek review of decisions of the Tax Court redetermining deficiencies asserted by the Commissioner in their income and victory taxes for the years 1941 to 1948, inclusive, and adding fraud penalties thereto under § 293(b) of the Revenue Code, 26 U.S.C. Since no books or records were produced, the Commissioner determined the taxpayers' income by increases in their net worth during the tax years. All items in the Commissioner's net worth statement were conceded to be correct except the amount of cash on hand on December 31, 1940.

The statement listed the adjusted cash on hand upon that date as zero. The taxpayer Kashat asserts that it was $38,000.00, the avails of an inheritance from his mother. His story of the source of this fund, while not in any important aspect controverted, led the Commissioner to doubt its verity and the Tax Court to characterize it as "bizarre" and as "fiction" and to conclude that it was untrue. The taxpayer's recital, insofar as relevant, follows.

The petitioner was born in 1903 in Telkaif, Iraq, formerly Mesopotamia, in a small farming community of perhaps a thousand houses. The family home there was a one-story, single room, building sparsely furnished and used as the living area. Underneath it was a single room basement with a dirt floor used for the storage of food and other articles. His mother had been twice married and the petitioner was the sole issue of the second marriage. The petitioner's father died before his birth and such estate he may have had passed to his mother. The petitioner's formal education was limited to several months schooling in early childhood. In 1927, he came to the United States with funds received from his mother, and proceeded immediately to Detroit where he worked for a time as laborer on a creamery truck at $10.00 per week and, thereafter, for the Ford Motor Company. He opened a grocery store in 1929 with a portion of the funds brought from home and whatever additional money he had been able to save since his arrival. Associated with him in the store were acquaintances, also from Iraq. After less than eight months operation, they purchased his interest for $50.00 which, except for a payment of $4.00, he never received. From that date on, he worked at various odd jobs until 1934 when he opened another grocery in Detroit with a partner who furnished no capital. After several months operations he bought out his partner for approximately $1,000 and continued to operate the store until 1936 when he sold the business for $5,700.00.

The taxpayer's mother died in Iraq in 1933. From the avails of the sale of his store he financed a voyage to Iraq and left the United States in November, 1936, arriving at Telkaif after Easter, 1937. Before her death, his mother had told a priest that the petitioner was her only heir. He knew that his mother had a crock buried in the basement of her home containing coins and jewelry and that she had been a lender of money obtained from her husband's estate. He succeeded in locating the crock, converted its contents into dinars worth about $29,000.00 in American funds. He also sold his mother's lands and collected various debts owing to her. The money from all three sources was later converted into American dollars and some English pounds to be used before returning to the United States.

While engaged in converting his mother's property into dinars, the petitioner married his present wife and together they left Telkaif in 1938, traveling leisurely via Cairo, Egypt and other Middle East cities, in the money markets of which he changed the rest of his dinars into American dollars. The Kashats arrived in the United States in January, 1939. The money in small pillowlike bags was distributed in several suitcases and covered with clothing. He made no declaration of the funds when leaving Iraq and there is nothing to show that this was required. He made no declara-

tion of the money to American customs agents and it is not claimed that he was required as a returning citizen to do so. The Customs Inspector examined but the smaller of the four suitcases which contained very little currency. Upon clearing customs, Kashat and his wife went immediately to Detroit by train. Within a week after his return, he purchased a grocery store for $3,000.00 in cash. Part of it was drawn from his bank account in the National Bank of Detroit. He operated this grocery during the entire period 1941 to 1948, inclusive. In 1941, he also bought his present home, paying therefor $7,000.00 in cash, $2,500.00 of which was withdrawn from a postal savings account and the balance from the National Bank. In 1944, he bought additional property consisting of two 2-family terraces for which he paid $11,000.00 in cash. Some of it came from his bank account. In 1943 and 1944, he purchased approximately $9,000.00 worth of United States Savings Bonds and on June 21, 1945 property in Detroit for $38,000.00, consisting of eight stores. This was paid for by cashing his Savings Bonds, borrowing $10,000.00 from the Bank and paying $19,000.00 in cash. The Bank loan was discharged in 1946 and 1947. The taxpayer also purchased a Lake lot in 1947 for $1,000.00 cash.

While the Tax Court discarded this entire story and entered judgment for some $43,000.00 in deficiencies and penalties, it apparently had some misgiving as to the soundness of its conclusions. After reciting that when viewed in the light of facts and circumstances surrounding the existence of an average citizen of this country the story was unconvincing yet "when viewed, however, in the light of the facts and circumstances surrounding the existence of a citizen of Iraq his testimony may be substantially true in accordance with what may actually be the fact. In this situation, it is most important that petitioner carry his burden of proof as to the asserted deficiency for we are without means to discover those landmarks by which it is possible to mark a course between the truth or falsity of petitioner's account of the source of his funds unless petitioner himself points them out. This he failed to do in a convincing manner."

It must be noted that the Tax Court decision was announced on May 27, 1954, approximately six months before the Supreme Court decided Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 135, 99 L.Ed. 150, and the associated cases of Friedberg, Smith and Calderon, decided the same day. Friedberg v. U. S., 348 U.S. 142, 75 S.Ct. 138, 99 L.Ed. 188; United States v. Calderon, 348 U.S. 160, 75 S.Ct. 186, 99 L.Ed. 202; Smith v. U. S., 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192. It did not have the benefit of the cautions therein announced and the pitfalls declared inherent in the net worth method nor the asserted need for the exercise of great care and restraint in the complex problem of ascertaining undisclosed income by the net worth method. It lacked the advantage of the importance stressed of accuracy in the establishment with reasonable certainty of an opening net worth to serve as a starting point from which to calculate future increases in assets. It was said in the Holland case "when the Government rests its case solely on the approximations and circumstantial inferences of a net worth computation, the cogency of its proof depends upon its effective negation of reasonable explanations by the taxpayer inconsistent with guilt. Such refutation might fail when the Government does not track down relevant leads furnished by the taxpayer—leads reasonably susceptible of being checked, which, if true, would establish the taxpayer's innocence."

The Government produced no evidence to corroborate its finding of no cash as the base for its net worth computation except that of an informer who had been sued for rent by the taxpayer and who understood that if his information led to recovery that he would receive substantial reward. In any event, that evi-

dence dealt only with the scale of living by the Kashat family in Iraq. This was not in controversy for the taxpayer had himself described his village and his home at Telkaif.

The Tax Court relied upon certain inconsistencies and contradictions in the taxpayer's conduct and evidence. It must, however, be observed that the taxpayer was ignorant, had little facility for accurate expression, was confused in his understanding of terms used in interrogation by the Agents of the Treasury and the direct and cross examination of counsel. Some of these inconsistencies were trivial and some had a measure of substance. His failure to put the funds in the Bank was explained as due to losses suffered in the bank closings of 1932. What stands out, however, in the Government's case is the total lack of any suggestion whatsoever as to a source of substantial income to the taxpayer other than the claimed inheritance. Certainly, it could not have come from the profits of his grocery. This was, at best, a minor operation. His maximum receipts were $65.00 a day and his average receipts much less than that. If this were not true the Treasury Agents undoubtedly could have demonstrated its falsity. They found no other activity of the taxpayer either before or during the taxable years that would lead to an inference of substantial undisclosed income. It is quite true that his story seems bizarre and it is also true that it conforms to a pattern now somewhat familiar, yet there are circumstances which point, somewhat feebly perhaps, yet clearly enough to suggest the possibility of verity. The petitioner purchased a grocery for $3,000.00 in cash within a week of his return from Iraq, his mother had paid for his migration to the United States and within a relatively short time after he came back he bought valuable property which called for substantial payments of cash. The Government submitted no affirmative proof of falsity. It based its case merely upon an inference of incredibility. There were no admissions to corroborate the net worth statement, as in Holland and associated cases, no sources of income uncovered from which substantial receipts of undisclosed income might be inferred. The story, of course, warranted the Commissioner in making investigation and the Tax Court in assuming that the taxpayer's narrative was fiction. In view of the well settled rule that the burden of proof, in respect to the deficiencies themselves, is on the taxpayer to show that the Commissioner's determination is invalid, Helvering v. Taylor, 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623; Rogers v. Commissioner, 6 Cir., 111 F.2d 987, 988, we are unable to say that the finding of the Tax Court in respect to such deficiencies is clearly erroneous.

The finding of fraud and an issue of limitation in which such finding becomes imperative, stand, however, in a different posture. Fraud is never presumed but must be established by clear and convincing evidence. There must be an intention to defraud. This the Tax Court clearly recognizes and the Statute, 26 U.S.C. § 1112 of the Internal Revenue Code commands. The Tax Court said: "The respondent has the burden of proving this issue. Fraud is not to be presumed. It must be proven by clear and convincing evidence." It has on occasion been held that proof of consistent and substantial understatement of income over several consecutive years may be substantial evidence of fraud, if together with other circumstances they point to an intention to evade taxation. Standing alone, however, the failure of a taxpayer to overcome the presumptive correctness of the deficiency does not of itself create a presumption of fraud. Both parties to a proceeding may fail through inadequate proof on the several issues. We recently had occasion to consider this principle in Drieborg v. Commissioner, 6 Cir., 225 F.2d 216, and, after review of the pertinent cases, concluded there must be additional independent evidence from which fraudulent intent on the part of the taxpayer can properly be inferred and that

the Commissioner cannot sustain the burden the Statute puts upon him merely by establishing deficiencies in tax. There are here no other circumstances to show deliberate intent to evade. The fraud penalties should be eliminated from the Tax Court's computation and determination. The Government's evidence fell far short of proof of fraudulent intent by the petitioners to evade their taxes.

A narrative which in the light of circumstances in other and more backward lands, standards of living and incentives to frugality, differing from our own, less confidence in banks, and more informal procedures in the passing of estates, is not to be transformed by mere fiat, because of its strangeness to an experienced and enlightened American mind, into the clear and convincing evidence, that is the inescapable imperative to a finding of fraud.

■■ This brings us to the question of the scope of the Commissioner's assertion of deficiencies and the statutory limitations thereon. The statutory notice of deficiencies was served on the petitioners on March 15, 1951 and their tax returns for 1942 through 1946 were filed more than three years prior to the service of the statutory notice. Section 275 Internal Revenue Code contains a three year limitation on assessments, except in the case of false or fraudulent returns, § 276. Since we find that the Commissioner failed to carry his burden of proof in establishing fraud by clear and convincing evidence, the asserted deficiencies for 1942 through 1946 are thereby barred. The deficiency for 1941 is sustained, since no return was filed for that year and the tax due upon income may be collected at any time. The deficiencies for 1947 and 1948 are sustained as coming within the statutory period for their assessment and collection. The penalties added to the 1941, 1947 and 1948 deficiencies are set aside and the cases are remanded to the Tax Court for redetermination of the taxes due by the petitioners, in conformity herewith.