George W. Vardine v. Commissioner.
Vardine v. Commissioner
Docket No. 352-66.
United States Tax Court
T.C. Memo 1969-57; 1969 Tax Ct. Memo LEXIS 238; 28 T.C.M. (CCH) 325; T.C.M. (RIA) 69057; March 24, 1969, Filed Theodore Reinhard, for the petitioner. Rudolph J. Korbel, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined deficiencies and additions to tax in petitioner's Federal income taxes for the calendar years 1949 through 1954 as follows: Overassess-
Income Tax
293(b)
294(d)(1)(A)
Year
ment
or 6653(b)
Deficiency
294(d)(2)
1949
$ 1,740.27
$ 870.14
$ 186.98
1950
11,791.99
5,896.00
1,091.05
1951
637.75
318.88
95.36
1952
[1] $245.63
$165.56
1,364.56
1953
1,199.82
304.89
2,254.99
1954
9,941.95
5,591.34
1,024.42
Totals
$245.63
$25,311.78
$470.45
$16,295.91
$2,397.81
The issues for decision are: (1) Whether respondent correctly increased petitioner's taxable income for the years 1949 through 1954 by the use of the net worth plus nondeductible personal expenditures method; (2) whether petitioner willfully filed false income tax returns, with the *240 intent to evade his taxes, for 1949 through 1954, and was therefore liable for additions to the tax under section 293(b) of the 1939 Internal Revenue Code, for the years 1949 through 1953, and under section 6653(b) of the 1954 Internal Revenue Code for the year 1954; (3) whether petitioner is liable for additions to the tax under section 294(d)(1)(A) of the 1939 Internal Revenue Code for the years 1949, 1950, 1951, and 1954, and under section 294(d)(2) of the 1939 Internal Revenue Code for the years 1952 and 1953; and by an amendment to respondent's answer whether petitioner is estopped in the instant case, by a prior criminal conviction under section 7201 of the 1954 Internal Revenue Code, from denying that a part of the underpayment of income tax for the taxable year 1954 is due to fraud; and further, by an amendment to the petition, whether the years 1949 through 1954 are barred by the statute of limitations. Findings of Fact Some of the facts have been stipulated and are so found. The stipulation and exhibits attached thereto are incorporated herein by this reference. George W. Vardine (hereinafter sometimes referred to as Vardine *241 or petitioner) had his legal residence at the time of the filing of the petition herein in Ft. Lauderdale, Florida. During the years 1948 through 1954, inclusive, he resided in Schenectady, New York. During the years in issue he was married but he and his wife filed separate returns. They have two children who were born in 1946 and 1954, respectively. Petitioner filed individual income tax returns for the calendar years 1948 through 326 1951, with the collector of internal revenue at Albany, New York, and for the calendar years 1952 through 1954, with the district director of internal revenue, Albany, New York. During the years in question petitioner reported his income on the cash basis; however, inventories were reflected in his cost of goods sold. Vardine was born in Italy and came to this country in 1918 when he was five or six years old. He attended school until the fifth grade, when he quit in order to go to work. He held various jobs between 1922 and 1935. These included driving a taxi, and at one time during this period he organized his own taxi company. In 1935, Vardine entered the commercial laundry feled on a modest scale, while still carrying on his taxi business. *242 Somewhat later, with about $5,000 cash savings, he set up a regular plant for the cleaning and renting of overalls and wiping towels. The Hofman Machinery Company financed the remaining cost of machinery and equipment totaling approximately $60,000 to $70,000. During the years in issue, Vardine worked exclusively in his commercial laundry business in Schenectady under the name of Star Overall Cleaning and Supply Co. (hereinafter sometimes referred to as Star). In September 1954, he purchased the Beach Laundromat in Hollywood, Florida. Star was conducted as a sole proprietorship. The income of Star was derived primarily from the renting and laundering of overalls and wiping towels. The majority of its expenditures were for overalls, wipers, labor, machinery, boilers, buildings and trucks. Sometime after 1938, petitioner's brother-in-law, William Connors (hereinafter sometimes referred to as Connors), came to work for petitioner. Petitioner's sister, Mafalda Connors, was also employed by petitioner as his superintendent. Connors was in charge of Star's office. His duties consisted of taking care of deliveries, routes, and the books and records. He had anywhere from one to three *243 girls assisting him, and was second in command to Vardine. Star's gross receipts were from route cash sales and regular charge sales. Route cash sales were generated by individual drivers who left the plant each morning with a load of clean overalls charged to each of them. Each driver had a prescheduled route and upon returning to the plant he would have either cash, charge slips (for the overalls rented), or overalls. A shortage would be charged to the driver. Regular charge sales resulted from the rental of overalls on a regular delivery basis to customers who paid Star by either check or cash on a monthly basis. Connors kept a 24-column cash book in which 22 columns were used to show cash disbursements, and the remaining two columns were used to show "Cash" or "On Account" receipts. Entries in the "Cash" column were posted from route cash sales (which information came from the drivers' records), and entries in the "On Account" column were posted from the checks received in the mail from regular charge sales. Vardine kept a notebook or "black book" in which was recorded the amounts due from customers on charge sales at the end of each month. Accounts receivable entries were *244 made in this book by the girl who made out the statements at the end of the month. It is not clear whether petitioner assisted in preparing bank deposit slips; he did, however, on occasion make the actual bank deposit. At the end of the year Connors would make up a recap sheet which was given to Benjamin Segel, an attorney who used the data thereon to prepare Vardine's income tax returns for the years 1949 through 1953. The 1954 return was prepared by Abraham Staff, an accountant, and filed in 1958. Segel, after preparing petitioner's returns for each of the taxable years 1949 through 1953, had conversations with petitioner regarding other income such as interest, dividends and capital gains. With the exception of those for 1951 and 1954, the only income reflected on petitioner's returns for the years in issue was that derived from Star. Such returns reported income as follows: 327 Income from
Deductions
Trade or
Other
Adjusted
from Adj.
Year
Business
Income
Gr. Income
Gr. Income
1949
$4,141.31
0
$4,141.31
$ 914.68
1950
4,510.69
0
4,510.69
1,409.63
1951
2,503.18
n2/ $ 1,535.31
4,038.49
776.74
1952
2,443.05
0
2,443.05
539.11
1953
5,250.28
0
5,250.28
1,024.07
1954
7,160.80
n3/ 255.00
[1](2,440.97)
n4/ 2,490.30
7,465.13
500.00
*245 Net Income
before De-
duction for
Taxable
Year
Exemptions
Exemptions
Income
1949
$3,226.63
$1,200.00
$2,026.63
1950
3,101.06
1,200.00
1,901.06
1951
3,261.75
1,200.00
2,061.75
1952
1,903.94
1,200.00
703.94
1953
4,226.21
1,200.00
3,026.21
1954
6,965.13
1,800.00
5,165.13
In 1957, Theodore Bouthillier, a special agent, (hereinafter sometimes referred to as Bouthillier), was assigned to examine into the income tax affairs of Vardine for the years 1949 through 1954. At that time the 1954 return had not been filed. Bouthillier contacted Vardine in September of 1957 and requested all his records for the years 1949 through 1954. Pursuant to his request he received canceled checks for the years 1954 and 1955, part of the payroll records covering the years 1954 and 1955, and a "cash receipts and disbursements book" for the years 1949 through 1955. Bouthillier did not receive the accounts receivable book and did not know one was in existence until sometime later. After examining the records submitted by petitioner, and based on *246 the fact that a 1954 return had not been filed by petitioner, Bouthillier scheduled another conference with Vardine on December 5, 1957. This meeting took place at Vardine's residence. Present at this meeting with Vardine and Bouthillier was Benjamin Wilkins, an accountant, and Abraham Staff, also an accountant, who joined the meeting while it was in progress. It was at this conference that Vardine's accountant, Abraham Staff, was advised by Wilkins to file the 1954 return. No reason was given at this conference for Vardine's failure to file the 1954 return. Bouthillier and Miller, the revenue agent assigned to the case, had a conference with Connors concerning the cash receipts and disbursements book. Connors told Bouthillier that all route cash sales were entered in the RECEIPTS - "Cash" column of the cash book, however, further entries were also made showing amounts paid out by the drivers from the gross receipts for such items as gas, oil, repairs, telephone calls, etc. The regular charge sales were entered separately in the "On Account" column as they were paid. Upon examining petitioner's books and records, Bouthillier found that for 1953 and 1954 the total deposits in the *247 business checking account did not equal the total amount recorded in the business cash book. This was so because not all of the entries for cash sales were deposited to the business checking account. Bouthillier, in conjunction with his examination of these books and deposit slips also interviewed many of Star's charge customers, and found that certain checks payable to Star were not recorded in its books and records. Bouthillier had obtained over 200 names of petitioner's customers and personally interviewed 15 or 20 of them. From these interviews Bouthillier obtained 22 canceled checks which had been made out to Star for services rendered in the years 1953 and 1954, and which had been cashed by Vardine personally. Fourteen of the checks were from 1953 and totaled $8,925.20; the remaining eight checks from 1954 and totaled $2,776.21. The practice in petitioner's business was to list the checks received during the day on a deposit slip and to stamp each check with a rubber stamp stating "for deposit." Only two checks of the 22 contained the "for deposit" endorsement, however, those two checks also bore the signature "George W. Vardine." The remaining 20 checks obtained by Bouthillier *248 showed only the handwritten endorsement: "Star Overall 328 Cleaning and Supply Co., George W. Vardine." During the taxable year 1952, Vardine personally cashed four checks, totaling $1,664.65, payable to Star. These checks were also endorsed "Star Overall Cleaning and Supply Co., George W. Vardine." Bouthillier, however, did not trace these checks through Star's cash receipts because he did not have the cash book at the time. In certain instances, Bouthillier attempted to get checks from Star's customers dating back to 1949, but for various reasons they had been destroyed or were unobtainable. Connors had spoken to Vardine about Vardine's practice of personally cashing checks; Vardine, however, told Connors that it was his (Vardine's) business. After Bouthillier's second meeting with Vardine, he attempted to reconcile certain information from petitioner's records to the income tax returns, but was unable to do so. He thereupon resorted to the net worth method of determining Vardine's correct income. Bouthillier, in preparing the net worth statement, sought information to establish Vardine's assets and liabilities. He made inquiries at banks in the Schenectady, New York, *249 area; inquired at the county clerk's office for leads of real estate purchases and for offsetting mortgages and chattel mortgages incurred upon the purchase of equipment used in the cleaning plant; and questioned Benjamin J. Segel, petitioner's attorney, as to the manner in which petitioner's 1949 through 1953 income tax returns were prepared. Bouthillier concluded, as a result of this interview, that for the years 1949 through 1953 the cash receipt columns and the cash disbursements columns in the cash book had been summarized once a month and at the end of the year the 12 months had been totaled and those summarized figures given to Segel to prepare the tax returns. In his investigation of Vardine's income tax affairs Bouthillier also learned that the petitioner had received taxable long-term capital gain income during the year 1952 in the amount of $511.99 from the sale of 100 shares of General Electric stock and 200 shares of Alleghany Ludlum Steel stock, which transactions were not reported on petitioner's income tax returns. During the taxable years 1950, 1951, 1952, 1953, and 1954, Vardine also received taxable dividend income in the amounts of $965, $1,673.80, $2,023.10, *250 $1,595.60, and $1,219.80, respectively, and for the years 1949 through 1954 taxable interest income in the amounts of $14.50, $113.92, $40.11, $21.73, $78.81, and $40, respectively. These amounts from dividends and interest were not reported in Vardine's federal income tax returns for such years. In preparing respondent's net worth statement, Bouthillier determined that Connors was, and had been quite familiar with Vardine's activities, and that Vardine's drawings for personal living expenses were set forth in the "personal" column of Star's cash book. Bouthillier, therefore, used the annual totals of such personal column as Vardine's personal living expenses. The total in the personal column of the cash book for each year was as follows: 1949
$7,237.02
1950
7,206.21
1951
4,096.81
1952
5,359.24
1953
6,720.31
1954
7,639.59 Bouthillier also increased the amount of petitioner's personal living expenses for 1954 by $921.10, which amount represented the payment by Star of real estate taxes on Vardine's residence. Bouthillier did not include in his determination of Vardine's personal living expenses the amounts spent by petitioner for trips to Europe in 1949 *251 and 1954. The 1949 trip cost at least $200, plus expenses, and the 1954 trip cost at least $500, plus expenses. After completing the net worth analysis, Bouthillier arranged a conference with Vardine on August 25, 1959, at the internal revenue office in Albany, New York, to discuss the items included therein. Those present at that meeting were Blodgett, Vardine's attorney; Miller, an internal revenue agent; Bouthillier; and O'Sullivan, acting Chief of the Intelligence Division. At that conference, when Vardine was questioned as to how much cash on hand he had at the beginning of the net worth period, he replied that he had between $5,000 and $10,000, which was comprised of money he received from his mother, and that he had also saved money on his own. He stated further that in subsequent years he never kept more than $200 to $300 on hand. Bouthillier established a cash on hand amount of $10,000 at the beginning of the net worth period - December 31, 1948. 329 At the August 25, 1959, meeting Vardine was questioned with respect to his practice of cashing checks payable to Star. He stated that he had used some of the money to meet payroll and that he also used it for personal *252 expenses, and to purchase stocks. Vardine was also questioned regarding a safe. He replied that he kept his cash on hand in a small safe at home and in his Mohawk National Bank safe deposit box, and that no one knew anything about it, not even his wife. When questioned as to gifts and inheritances, he mentioned that, except for the money given to him by his mother prior to her death, he had never been given any money. On a loan application dated August 13, 1951, petitioner applied for a mortgage loan of $20,000. In reply to a question concerning petitioner's income from his business there was written therein "$1,000 month." Vardine's signature was at the bottom of the loan application and immediately under the legend, "I certify that the foregoing is true and complete." On February 11, 1960, petitioner was indicted by the grand jury, in the United States District Court for the Northern District of New York, said indictment charging, in pertinent part: COUNT I * * * That on or about the 15th day of March, 1954, in the State and Northern District of New York, the above named defendant, GEORGE W. VARDINE, late of Schenectady, New York, did willfully and knowingly attempt to *253 evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 1953, by filing and causing to be filed with the Director of Internal Revenue for the Albany, New York Internal Revenue Collection District at Albany, New York, a false and fraudulent income tax return wherein he stated that his net income for said calendar year was the sum of $4,226.21, and that the amount of tax due and owing thereon was the sum of $696.45, whereas, as he then and there well knew, his net income for the said calendar year was the sum of $18,029.03, upon which said net income he owed to the United States of America an income tax of $6,227.76. * * * COUNT II * * * That on or about May 23, 1958, in the State and Northern District of New York, GEORGE W. VARDINE, the defendant herein, late of Schenectady, New York, did wilfully and knowingly attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 1954, by filing and causing to be filed with the Director of Internal Revenue for the Albany, New York Internal Revenue Collection District at Albany, New York, a false and *254 fraudulent income tax return wherein he said that his net income for said calendar year was the sum of $5,165.13, and that the amount of tax due and owing thereon was the sum of $1,132.72, whereas, as he then and there well knew, his net income for the said calendar year was the sum of $27,258.99, upon which said net income he owed to the United States of America an income tax of $11,234.10. Vardine was tried before a jury in the United States District Court for the Northern District of New York, and was convicted on both counts. On January 16, 1961, he was sentenced to six months' imprisonment on each count, the sentences to run concurrently, and was fined $2,000 on each. On appeal, the Court of Appeals for the Second Circuit affirmed the conviction for 1954 but reversed as to the year 1953. United States v. Vardine, 305 F. 2d 60 (C.A. 2, 1962). On October 1, 1952, Vardine moved for a reduction of sentence and, pursuant to his motion, the term of imprisonment was reduced from six months to three months. On October 20, 1965, respondent sent petitioner a statutory notice of deficiency for the years 1949 through 1954, based on the net worth method of reconstructing *255 income. Included in the notice of deficiency was the following schedule of petitioner's net worth increases and personal expenditures: 330 EXHIBIT A
Mr. George W.
Vardine c/o Louis
Lombardi 34 Jay
Street Schenectady 5,
New York COMPUTATION OF
TAXABLE INCOME BY NET
WORTH METHOD
ASSETS
Dec. 31, 1948
Dec. 31, 1949
Dec. 31, 1950
Dec. 31, 1951
Cash on hand
$ 10,000.00
$ 300.00
$ 300.00
$ 300.00
Cash in Banks
1,626.14
19,733.16
15,774.71
4,593.88
Mortgage receivable
2,500.00
2,397.20
Real estate -
7,898.76
7,898.76
7,898.76
7,898.76
Residence and Lots
Securities
27,028.88
23,867.07
Investment - Star
4,500.00
4,500.00
4,500.00
5,000.00
Overall and Cleaning
Supply Co. Land
Buildings
17,227.13
17,227.13
17,227.13
62,627.13
Machinery and
79,500.38
88,898.53
97,032.11
130,887.93
Equipment
Investment in Beach
Laundromat -
Hollywood, Florida
Investment - Star
Overall Cleaning Fort
Lauderdale, Florida
Total assets
$120,752.41
$138,557.58
$172,261.59
$237,571.97
EXHIBIT A
Mr. George W.
Vardine c/o Louis
Lombardi 34 Jay
Street Schenectady 5,
New York
COMPUTATION OF
TAXABLE INCOME BY NET
WORTH METHOD
ASSETS
Dec. 31, 1952
Dec. 31, 1953
Dec. 31, 1954
Cash on hand
$ 600.
Cash in Banks
3,626.17
9,943.87
15,557.50
Mortgage receivable
2,397.20
2,397.20
3,000.00
Real estate -
7,898.76
7,898.76
8,398.76
Residence and Lots
Securities
30,579.86
38,441.35
9,933.87
Investment - Star
6,500.00
6,500.00
6,500.00
Overall and Cleaning
Supply Co. Land
Buildings
63,084.08
69,877.21
69,877.21
Machinery and
140,516.01
146,666.40
169,557.86
Equipment
Investment in Beach
27,204.00
Laundromat -
Hollywood, Florida
Investment - Star
12,000.00
Overall Cleaning Fort
Lauderdale, Florida
Total assets
$254,902.08
$282,024.79
$322,329.20
*256 331 Mr. George W. Vardine
COMPUTATION OF
TAXABLE INCOME BY NET
WORTH METHOD
(Continued)
LIABILITIES AND
Dec. 31, 1948
Dec. 31, 1949
Dec. 31, 1950
Dec. 31,
RESERVES
1951
William J. Connors
$ 3,400.00
$ 3,400.00
$ 3,400.00
$ 3,400.00
Schenectady Trust Co.
1,229.58
534.11
Spencer Trash and
6,420.48
6,057.02
Company
Mohawk National Bank
3,535.78
20,000.00
First Trust Company
311.68
873.18
State Bank of Albany
General Motors
2,074.17
555.65
Acceptance Corp.
Samuel and Rita
5,900.00
5,900.00
5,900.00
Scheinerman
Pantex Manufacturing
1,586.61
Corp.
Ralph Barone
12,000.00
U.S. Hoffman
19,560.00
15,120.00
8,020.00
4,320.00
Machinery Corp.
Antonoa Ferro
Schenectady Hardware
2,283.11
& Electric Co.
Joseph C. Mihlowitz &
3,256.82
Son
Cummings-Landau
1,600.00
400.00
870.00
Machinery Company
Manufacturers
4,826.00
National Bank
Miller Laundry
12,000.00
Machinery Company
National Cash
Register Company
Western Gateway
Roofing Company
Prosperty Company,
Inc. - Contracts
#9047c and 9422
Le Valley McLeod,
Inc.
Fort Lauderdale
National Bank
Reserve for
19,792.35
33,205.58
46,733.19
63,182.78
depreciation
Total liabilities and
$50,193.61
$64,168.65
$72,947.84
$134,337.99
depreciation reserve
Net Worth
$70,558.80
74,388.93
$99,313.75
$103,233.98
Less: Net Worth-end
70,558.80
74,388.93
99,313.75
of preceding year
Increase in not worth
$ 3,830.13
$24,924.82
$ 3,920.23
*257 EXHIBIT A
Mr. George W. Vardine
COMPUTATION OF
TAXABLE INCOME BY NET
WORTH METHOD
(Continued)
LIABILITIES AND
Dec. 31, 1952
Dec. 31, 1953
Dec. 31, 1954
RESERVES
William J. Connors
$ 3,400.00
$ 3,400.00
$ 3,400.00
Schenectady Trust Co.
Spencer Trash and
2,729.63
Company
Mohawk National Bank
35,746.69
40,855.39
27,302.97
First Trust Company
1,028.06
State Bank of Albany
702.78
967.04
180.80
General Motors
2,273.70
872.38
Acceptance Corp.
Samuel and Rita
Scheinerman
Pantex Manufacturing
466.65
Corp.
Ralph Barone
U.S. Hoffman
1,200.00
Machinery Corp.
Antonoa Ferro
1,000.00
1,000.00
1,000.00
Schenectady Hardware
2,240.06
1,290.06
290.06
& Electric Co.
Joseph C. Mihlowitz &
2,483.84
1,888.34
688.34
Son
Cummings-Landau
7,525.00
5,775.00
3,150.00
Machinery Company
Manufacturers
2,032.00
National Bank
Miller Laundry
7,639.51
4,598.41
2,859.07
Machinery Company
National Cash
1,199.63
Register Company
Western Gateway
685.00
Roofing Company
Prosperty Company,
16,268.00
Inc. - Contracts
#9047c and 9422
Le Valley McLeod,
1,527.30
Inc.
Fort Lauderdale
2,500.00
National Bank
Reserve for
80,529.26
95,315.68
117,446.36
depreciation
Total liabilities and
$144,965.79
$161,806.31
$178,684.91
depreciation reserve
Net Worth
$109,936.29
$120,218.48
$143,644.29
Less: Net Worth-end
103,233.98
109,936.29
120,218.48
of preceding year
Increase in not worth
$ 6,702.31
$ 10,282.19
$ 23,425.81
*258 332 Mr. George W. Vardine
COMPUTATION OF TAXABLE INCOME
BY NET WORTH METHOD (Continued)
Dec. 31, 1949
Dec. 31, 1950
Dec. 31, 1951
Dec. 31, 1954
(Increase in net worth-carried
$ 3,830.13
$24,924.82
$ 3,920.23
forward)
Plus: Personal living expenses
7,237.02
7,206.21
4,096.81
Total
$11,067.15
$32,131.03
$ 8,017.04
Less: Nontaxable portion of capital
1,417.43
gains and dividend exclusion in the
year 1954
Adjusted gross income
$11,067.15
$32,131.03
$ 6,599.61
$29,286.41
Less: Deductions per return
$ 914.68
$ 1,409.63
$ 776.74
Unallowable medical deductions
(292.93)
(671.03)
(131.13)
Allowable deductions
$ 621.75
$ 738.60
$ 645.61
Corrected net income
$10,445.40
$31,392.43
$ 5,954.00
Less: Exemption
Corrected taxable income
Net income per return
3,226.63
3,101.06
3,261.75
Taxable income per return
Unreported net income
$ 7,218.77
$28,291.37
$ 2,692.25
Unreported taxable income
EXHIBIT A
Mr. George W. Vardine
COMPUTATION OF TAXABLE INCOME
BY NET WORTH METHOD (Continued)
Dec. 31, 1952
Dec. 31, 1952
Dec. 31, 1953
Dec. 31, 1954
(Increase in net worth-carried
$ 6,702.31
$10,282.19
$23,425.81
forward)
Plus: Personal living expenses
5,359.24
6,720.31
8,560.69
Total
$12,061.55
$17,002.50
$31,986.50
Less: Nontaxable portion of capital
511.99
2,700.09
gains and dividend exclusion in the
year 1954
Adjusted gross income
$11,549.56
$17,002.50
$29,286.4117,
002.50
$29,286.41
Less: Deductions per return
$ 539.11
$ 1,024.07
$ 500.00
Unallowable medical deductions
(170.49)
Allowable deductions
$ 539.11
$ 853.58
$ 500.00
Corrected net income
$11,010.45
$16,148.92
$28,786.41
Less: Exemption
1,800.00
Corrected taxable income
$26,986.41
Net income per return
1,903.94
4,226.21
Taxable income per return
5,165.13
Unreported net income
$ 9,106.51
$11,922.71
Unreported taxable income
$21,821.28
*259 333 The parties now agree that for the year 1954, Mortgage Receivable, Real Estate - Residence and lots, and Machinery and Equipment, should be valued respectively at $2,397.20, $8,198.76, and $168,965.86, and as a consequence (except for cash on hand and personal living expenses) petitioner and respondent are now in agreement as to all items of the net worth statement. Opinion Respondent increased petitioner's taxable income for the years 1949 through 1954, by the net worth plus nondeductible personal expenditures method. Petitioner contests the correctness of only the cash on hand and personal living expenses in the net worth statement; contests that he willfully filed false income tax returns with intent to evade his taxes; contests the determined additions under section 294(d)(1)(A) and 294(d)(2) of the 1939 Internal Revenue Code; asserts that he is not collaterally estopped from denying that a part of the underpayment in 1954 was due to fraud; and finally, asserts that the years 1949 through 1954 are barred by the statute of limitations. Respondent, by amendment to his answer, alleges that petitioner is collaterally estopped by a prior criminal conviction under *260 section 7201 of the Internal Revenue Code from denying that a part of the underpayment of income tax for the taxable year 1954 was due to fraud. As regards collateral estoppel, it is undisputed that petitioner is the same person who was the defendant in the criminal case of United States v. Vardine, in the United States District Court for the Northern District of New York and in the United States Court of Appeals for the Second Circuit. We have previously held that a criminal conviction based upon an indictment charging a willful attempt to evade or defeat a tax necessarily carries with it the ultimate factual determination that the resulting deficiency was due to fraud. Our foundation for this holding was based on the fact that the term willfully, as used in section 7201 of the Internal Revenue Code, "has authoritatively been defined in prior judicial decisions to encompass all of the elements of fraud which are envisioned by the civil penalty described in section 6653(b)." John W. Amos, 43 T.C. 50, 55 (1964), affd. 360 F. 2d 358 (C.A. 4, 1965). Accordingly, we sustain respondent's determination and assertion *261 of fraud for the year 1954. Petitioner argues briefly that the Amos doctrine should not be applied in the instant case because more years were encompassed in this, than in the criminal trial, and because more evidence was here presented by petitioner. We find these reasons entirely without persuasion. Petitioner asserts, as a defense, the statutes of limitations under both the 1939 and 1954 Internal Revenue Code. [2]
*262 The statute of limitations is not a bar to assessment and collection if the petitioner filed a false or fraudulent return with intent to defeat or evade tax for such year. [3] Therefore, except for 1954, for which we have already found that petitioner is collaterally estopped, the primary question to be determined is whether for any of the years involved herein the petitioner filed "a false 334 or fraudulent return with the intent to evade tax." The burden of proving fraud is upon the respondent. He must show, by clear and convincing evidence, that the taxpayer understated a part of his *263 income with intent to evade the tax. William H. Parsons, 43 T.C. 378, 393 (1964); Lawrence Sunbrock, 48 T.C. 55, 64 (1967). Petitioner admits the existence of a deficiency for each of the years in issue, but denies that it was the result of an attempt to defeat or evade the tax. We find and hold that respondent has met his burden of proof. On brief, petitioner, in an effort to show lack of intent, attempts to characterize himself as an individual with very little education who was completely oblivious to Federal tax responsibilities. We are unconvinced that petitioner was as ignorant as he would have us believe. Petitioner started his own taxicab company and, by himself, with a minimum of capital, embarked into the commercial laundry business wherein he continuously expanded his business to the point that he operated a large plant employing many drivers on a regular basis, in addition to factory and office help. Petitioner argues that since his tax returns were prepared by an attorney for the years 1949 through 1953, and by an accountant for 1954, that he was unaware of the understatements (from both passive and business income) and therefore incapable *264 of the requisite fraudulent intent. Petitioner's position is untenable. We cannot believe that petitioner, who was certainly endowed with some business acumen, was completely devoid of some knowledge of the application and reporting requirements of the Federal revenue laws. With respect to petitioner's unreported passive income, consisting of interest, dividends and capital gains, he stated at trial that he told his attorney, Segel, about these items for the years 1949 through 1953. Segel, however, by testimony at petitioner's prior criminal trial (which, by stipulation, is considered as evidence in the instant case) testified that he asked petitioner about these items each year and that each year petitioner stated he had none. Although petitioner's 1951 tax return, prepared by Segel, reported a capital gain, we find it difficult to believe, as petitioner seems to imply, that Segel, sua sponte, decided when vel non to report petitioner's passive income. Petitioner's unreported dividend income alone in 1952 was $2,023.10. This is larger than the amount reported on his 1952 return as his net income, and is only about $400 less than the amount he reported as adjusted gross income. *265 For 1950 and 1953 the unreported dividend income was over 20 percent and 25 percent, respectively, of petitioner's reported adjusted gross income, and for 1951 this percentage was almost 40. We believe that petitioner did inform Segel of his passive income, however, in light of the large amounts involved, we do not believe that petitioner was unaware that this "other income" was not reported on his tax returns for 1949 through 1953. We thus find petitioner's testimony on this point implausible. Richard F. Smith, 31 T.C. 1, 9 (1958). Petitioner argues that he never posted entries in Star's books and that this is evidence of his lack of intent to defeat or evade taxes. While it may be true that petitioner made no entries in the books, this is of little consequence, since respondent has adequately demonstrated petitioner's course of conduct in cashing unrecorded customers' checks. Since the books and records contained no entries of the checks cashed by petitioner, the transmittal of the figures in Star's books, by Connors, to petitioner's attorney and accountant for the purpose of preparing income tax returns was nothing more than the final step in petitioner's scheme *266 to evade taxes. Respondent introduced evidence of petitioner's practice of cashing customers' checks as proof of intent and as proof of a likely source of unreported taxable income. Petitioner, on brief, goes into detail as to why respondent's method of tracing was inadequate. Basically, petitioner's argument centers around the fact that for the year 1953 the totals on Star's deposit slips exceeded the total of the checks listed thereon and that the total of checks listed on the deposit slips exceeded the total of the entries in the "On Account" column of the cash book. 335 Petitioner contends that since the total in the "On Account" column did not agree with the total of the checks on the deposit slips that additional deposits came from other sources and that in 1953 one of these sources was loans totaling $8,000. On this basis petitioner argues that the special agent's inference that the cashed checks were not reflected in cash receipts, was totally without factual foundation and based on conjecture. We disagree. Preliminarily we observe that we are cognizant of the grave financial and social penalties imposed by a finding of fraud and we have considered with great detail *267 the many exhibits and multitudinous testimony in this case. In particular we have inspected the exhibits and the procedures used by respondent's agent in tracing Star's checks through its cash book. We believe that respondent's agent's tracing and inspection of the books and records was proper, taking into account the nature of petitioner's records, and that the resulting inference was much more than mere conjecture. Petitioner endeavors to explain that his practice of cashing customers' checks was to meet payroll obligations and business expenses. (He admitted to Bouthillier, however, that he had used some of the money for personal expenses, and to purchase stocks.) At trial he stated that he cashed customers' checks because of frequent overdrafts in the business checking account. The record fails to support petitioner's last stated explanation, and we note from a stipulated portion of the criminal trial record that when Connors questioned petitioner as to his practice of cashing customers' checks, petitioner told Connors "it was his business." Petitioner, in a further effort to explain that his understatements were not indicative of fraudulent intent, prepared his own net worth *268 exhibit. He contends that a large part of the understatements for the years 1949 through 1953 should be attributed to Connor's "primary bookkeeping and accounting knowledge" and therefore not evidence of any fraudulent intent by petitioner. We find this argument untenable for several reasons. First, there is evidence of fraudulent intent from petitioner's conduct of cashing checks of Star's customers without entry in the cash book. Further, we find that the omission of dividends, interest and, except for 1951, capital gains, are also indicia of petitioner's fraudulent intent. Additionally, we note that some weight must be given to petitioner's loan application dated August 13, 1951, wherein he certified that his income was "$1,000 month," when, in fact, his income tax returns for 1949 through 1954 showed adjusted gross income of $4,141.31; $4,510.69; $4,038.49; $2,443.05; $5,250.28 and $7,465.13, respectively. Moreover, the tax returns were prepared from the books and not the deposit slips, therefore if checks or cash were deposited without being recorded in the cash book there would be an even larger deficiency. Finally, even if we were to accept petitioner's net worth computation *269 there would still be an unexplained bulge in his net income for each of the years 1949 through 1953. The total bulge for all five years would amount to almost $37,000. We recognize the inherent dangers of circumstantial evidence, [4] however, where likely sources of unreported taxable income have been shown (here dividends, interest, capital gains and unrecorded checks), we have often held that such understatements are evidence of fraudulent intent. United States v. Calderon, 348 U.S. 160 (1954); Abraham Galant, 26 T.C. 354, 365 (1956). Cf. United States v. Massei, 355 U.S. 595 (1958). Accordingly, we find and hold on the basis of the entire record, that some part of the deficiency for each year in issue was due to fraud. Petitioner contests respondent's cash on hand figure and the computation of personal living expenses. He also urges adjustments to the net worth statement be made because of technical errors. While the burden of proof as to fraud is upon respondent, the burden of proof, with respect to the *270 deficiencies themselves, is on petitioner. Kashat v. Commissioner, 229 F. 2d 282 (C.A. 6, 1956). Petitioner, therefore, must overcome the presumption of correctness attaching to respondent's determination of deficiencies. Abraham Galant, supra.We find that (except as hereinafter detailed) he has failed to sustain such burden. 336 Although petitioner had previously denied respondent's determination of petitioner's cash on hand for 1949 through 1954, on brief he contests only the cash on hand figures at December 31, 1948, and December 31, 1949. It is his position that as of December 31, 1948, and December 31, 1949, he had on hand $20,000 and $10,000, respectively. For the remaining years, 1951 through 1954, petitioner accepts respondent's determination of $300. Petitioner relies heavily upon his own testimony; the testimony of his sister that he had this cash on hand; a savings account opened in 1949, wherein he allegedly deposited funds from his cash on hand; and two stock purchases in 1950, which allegedly were paid for from funds in the savings account. Not only was petitioner's sister not an "arm's-length" witness, but we found her testimony rather *271 general and weak, with little conviction. We found petitioner's testimony incomplete and conflicting as to the origin of his alleged cash hoard and from where it was withdrawn to purchase stock. On direct examination by his attorney petitioner testified: Q. Can you tell me if you purchased on March 14th, 1950, 100 shares of Standard Oil of New Jersey and on March 16th, 1950, 100 shares of Niagara Mohawk Power? A. Yes, I did. Q. Did you at that time make a payment of approximately $9120 for those shares of stock? A. I did. Q. And where did that payment come from? A. I had that in my safe. Q. You had that in your safe? A. Sure. Q. Did you hear the testimony of the agent that you had - that that came from your savings account? A. It came from my savings account? Q. Yes. As to petitioner's savings account we are unconvinced that this money could not have been generated from the cashing of customers' checks. Petitioner has failed to carry his burden and we therefore approve respondent's finding of petitioner's cash on hand at December 31, 1948, and December 31, 1949. At trial and on brief petitioner asserted that he received $500 a year from his wife. Petitioner *272 argues that this amount was substantiated because his wife was gainfully employed and filed her own income tax return. Such evidence falls far short of sustaining petitioner's burden. Petitioner at trial introduced into evidence an exhibit which purports to show errors on the face of his returns for the years 1949 through 1953. We admitted petitioner's exhibit on the basis of his representation that it would be used to show a lack of intent. On brief petitioner relies on these alleged errors in an attempt to establish that respondent improperly computed petitioner's net worth. We have examined petitioner's adjustments and agree with the theory of their application, e.g., the reflection of lost overalls in ending inventory; however, petitioner has offered no evidence to support his contentions and we must therefore find against him because of a failure of proof. Except for 1954, respondent, in preparing the net worth schedule for the years 1949 through 1954, used the annual total of the "personal" column in Star's cash book as the amount of petitioner's personal living expenses. In 1954 respondent added $921.10 to such total because Star had paid the realty taxes on petitioner's *273 residence and such item was not in the "personal" column. [5]
It is petitioner's contention that he established living expenses of $80 a week by his own testimony. The core of his argument is centered around the fact his wife worked, allegedly helped maintain the household and bought the children's clothes. He furnishes us with little detail. We find his self-serving conclusions inadequate to sustain his burden. Further, regarding respondent's determinations, petitioner offered evidence that certain items contained in the aforesaid 1953 personal column of Star's cashbook reflected Chamber of Commerce dues, a fee to a collection attorney hired by Star and certain small loans which Star had made to employees. [6] 337 We have examined respondent's *274 exhibits and, on the basis of petitioner's testimony, we find that respondent's determination of petitioner's personal living expenses for 1953 should be reduced by $856.68, which is the total of these items. Petitioner has not otherwise sustained his burden regarding respondent's determination of personal living expenses and consequently such determination is sustained. Respondent determined penalties under section 294(d)(1)(A) [7] of the 1939 Internal Revenue Code, for failure to file declaration of estimated tax for the years ended December 31, 1949, 1950, 1951 and 1954; and under section 294(d)(2) [8] of the 1939 Internal Revenue Code for substantial underestimation of estimated tax for the years ended December 31, 1952 and 1953. *275 Petitioner does not fall within any of the exceptions provided by section 294(d)(2) and the record herein falls far short of establishing the reasonable cause required under section 294(d)(1)(A). We therefore hold him liable for the above additions to tax based on the adjusted deficiencies as determined herein. Decision will be entered under Rule 50. Footnotes
1. Overassessment for 1952 results from an additional assessment made by respondent on November 23, 1955.↩
1. Loss from Beach Laundromat SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276 - (a) General Rule. - The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period. * * * (c) Omission from Gross Income. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule. - Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. * * * (e) Substantial Omission of Items. - Except as otherwise provided in subsection (c) - (1) Income Taxes. - In the case of any tax imposed by subtitle A - (A) General Rule. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. * * *
[2] Net Long-Term Gain SEC. 276. SAME - EXCEPTIONS. (a) False Return or No Return. - In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * * (c) Exceptions. - (1) False Return. - In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.
[3] Dividend Income "Some circumstantial evidence is very strong, as when you find a trout in the milk." Thoreau, Journal (November 11, 1854).
[4]↩ Net Long-Term Gain
5. We do not disturb this action, even though this is a deductible item, because petitioner used the standard deduction for 1954, and the record is silent as to his wife's return.↩
6. Petitioner explained that Star's employees would frequently need money between pay days to meet personal obligations, therefore Star would loan the money to the employees, and at the end of each week the loan would be deducted from their pay.↩
7. SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT. * * * (d) Estimated Tax. - (1) Failure to file declaration or pay installment of estimated tax. - (A) Failure to file declaration. - In the case of a failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is shown to the satisfaction of the Commissioner to be due to reasonable cause and not to willful neglect, there shall be added to the tax 5 per centum of each installment due but unpaid, and in addition, with respect to each such installment due but unpaid, 1 per centum of the unpaid amount thereof for each month (except the first) or fraction thereof during which such amount remains unpaid. In no event shall the aggregate addition to the tax under this subparagraph with respect to any installment due but unpaid, exceed 10 per centum of the unpaid portion of such installment. For the purposes of this subparagraph the amount and due date of each installment shall be the same as if a declaration had been filed within the time prescribed showing an estimated tax equal to the correct tax reduced by the credits under sections 32 and 35. ↩
8. (2) Substantial underestimate of estimated tax. - If 80 per centum of the tax (determined without regard to the credits under sections 32 and 35), in the case of individuals other than farmers exercising an election under section 60(a), or 66 2/3 per centum of such tax so determined in the case of such farmers, exceeds the estimated tax (increased by such credits), there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax so increased, whichever is the lesser. This paragraph shall not apply to the taxable year in which falls the death of the taxpayer, nor, under regulations prescribed by the Commissioner with the approval of the Secretary, shall it apply to the taxable year in which the taxpayer makes a timely payment of estimated tax within or before each quarter (excluding, in case the taxable year begins in 1943, any quarter beginning prior to July 1, 1943) of such year (or in the case of farmers exercising an election under section 60(a), within the last quarter) in an amount at least as great as though computed (under such regulations) on the basis of the taxpayer's status with respect to the personal exemption and credit for dependents on the date of the filing of the declaration for such taxable year (or in the case of any such farmer, or in case the fifteenth day of the third month of the taxable year occurs after July 1, on July 1 of the taxable year) but otherwise on the basis of the facts shown on his return for the preceding taxable year. In the case of taxable years beginning prior to October 1, 1950, and ending after September 30, 1950, the additions to tax prescribed by this subsection shall not be applicable if the taxpayer failed to meet the 80 per centum and 66 2/3 per centum requirements of this paragraph by reason of the increase in normal tax and surtax on individuals imposed by section 101 of the Revenue Act of 1950. In the case of taxable years beginning prior to November 1, 1951, and ending after October 31, 1951, the additions to tax prescribed by this subsection shall not be applicable if the taxpayer failed to meet the requirements of this paragraph by reason of the increase in rates of tax on individuals imposed by the Revenue Act of 1951.↩